1

2

3

4

5

6

7                          UNITED STATES DISTRICT COURT

8                          EASTERN DISTRICT OF CALIFORNIA

9

10   **MARTINI E RICCI IAMINO S.P.A. –**          **CASE NO. 1:13-CV-276 AWI SAB**
     **CONSORTILE SOCIETA AGRICOLA,**
11   **an Italian Company,**

12                  **Plaintiff**                   **ORDER ON MOTIONS FOR**
                                                    **SUMMARY JUDGMENT**
13                  **v.**

14   **TRINITY FRUIT SALES COMPANY,**
     **INC., a California Corporation, and DOES**   (Doc. Nos. 21, 22)
15   **1-20,**

16                  **Defendant**

17

18

19          This case stems from the provision of kiwi fruit from Plaintiff Martini E Ricci Iamno

20   S.P.A. ("M&R") to Trinity Fruit Sales Company, Inc. ("Trinity").  The active complaint is the

21   First Amended Complaint ("FAC").  M&R alleges five causes of action against Trinity in the

22   FAC:  (1) breach of contract under the United Nations Convention for the International Sale of

23   Goods ("CISG");[1] (2) breach of written contract; (3) price of goods; (4) account stated; and (5)

24   open book account.  M&R now moves for summary judgment, and Trinity through its opposition

25   counter moves for summary judgment.  For the reasons that follow, M&R's motion will be denied

26   and Trinity's counter motion will be granted in part and denied in part.  Additionally, the Court

27   will give the parties the opportunity to file a request for a second summary judgment motion.

28   _____
     [1] The CISG has been reprinted at 15 U.S.C. App'x (1998).

**FACTUAL BACKGROUND**

M&R is an Italian company that grows kiwi fruit on its property in Italy.  See PUMF 1.[2]
Andrea Martini ("Martini") is the Vice President of M&R.  PUMF 2.  Gary Raden ("Raden") and
Stefano De Nadai ("De Nadai") worked together and were something between an agent and broker
for M&R.  See Raden Depo. 8:15-10:10, 66:11-66:18.  Raden explained that they solicit the
product from producers/suppliers and negotiate the sales with the receivers.  See id. at 8:15-20,
9:21-10:10.  Raden is located in the United States, and De Nadai is located in Italy.  See id. at 7:8-
8:2, 9:21-10:4.  Raden and De Nadai were involved in the solicitation of fruit from M&R for the
transaction with Trinity.  See id. at 10:2-10:19.  Martini worked with De Nadai on a regular basis,
and De Nadai was aware of the general terms under which M&R sold kiwis, including the prices
M&R expected for various sizes and quantities.  PUMF 4.  Martini has characterized Raden and
De Nadai as independent sales people who are not employees of M&R.  See Martini Dec. ¶ 3.
M&R paid Raden and De Nadai fees of 3% for their services, but Trinity paid Raden and De
Nadai nothing.  See Raden Depo. 66:20-67:1.  Raden would typically negotiate with Trinity, pass
the order information on to De Nadai, and De Nadai would transmit the order to M&R by e-mail.
PUMF 7.  De Nadai's e-mail orders were copied to Raden, who would confirm that the e-mail
reflect the agreement struck with Trinity.  See PUMF 8.

In 2007, De Nadai contacted Trinity about marketing and selling M&R's kiwis to the open
market on an open consignment basis.  See White Dec. ¶ 4.  Trinity and M&R reached an oral
agreement for the marketing and sale of M&R's 2007 kiwi crop on an open consignment basis.
See id. at ¶ 5.  In two e-mails dated November 15, 2007 and November 16, 2007, De Nadai
confirmed that M&R would supply kiwis on an open consignment basis for the open market.  See
id.; Trinity Ex. B at Bates Nos. 000086, 000088.  Trinity marketed and sold M&R's 2007 kiwis on
an open consignment basis, transmitted accountings and the net proceeds of the sales to M&R, and
M&R accepted the accountings and net proceeds without objection.  See White Dec. ¶ 6.

In late 2008, De Nadai and Raden contacted Trinity regarding the option to market and sell
M&R's 2008-2009 kiwi crop.  See id. at ¶ 7.  Trinity agreed to conduct business with M&R

---

[2] "PUMF" refers to Plaintiff's Undisputed Material Fact.  2

regarding the 2008-2009 crop.  See Martini Dec. ¶ 4; White Dec. ¶ 8.  Martini characterizes the relationship as M&R selling kiwis to Trinity, while Trinity's President, David White, declares that Trinity agreed to market and sell Martini's kiwis on an open consignment basis, just as in 2007.  See id.  Generally, there were two types of kiwi shipments involved between M&R and Trinity regarding M&R's 2008-2009 kiwi crop.  See Martini Dec. ¶ 4; White Dec. ¶ 9.  The first type involved 14 kg. boxes that were to be sold to Trinity's customers Costco and Sam's Club at fixed prices.  See id.; PUMF 11.  Raden confirmed that the 14 kg. boxes were fixed price loads for sale to Costco or Sam's Club, with the price per box indicated on the confirming order e-mail.  PUMF 11.  M&R provided 4 loads of the 14 kg. boxes.  See White Dec. ¶ 4.  The second type involved consignments of 9 kg. boxes of kiwis to be sold on the general market.  See Martini Dec. ¶ 4; White Dec. ¶ 9.  Raden also testified that all of the 9 kg. boxes were consignment deliveries for sale on the open market, as indicated on the e-mail orders sent from De Nadai to Martini.  PUMF 12.  M&R provided 5 containers of 9 kg. boxes.  See id.  At no time did M&R sell kiwis directly to Trinity, nor did Trinity ever agree to purchase kiwis from M&R.  See White Dec. ¶ 13.  Trinity did not purchase the 14 kg. boxes from M&R and resell them to Costco, rather Trinity handled the 14 kg. boxes on consignment and took a commission for the sale of the 14 kg. boxes to Costco.  See id. at ¶ 12.

Martini declares that there was a minimum price expectation for the 9 kg. boxes.  See Martini Dec. ¶ 4.  Martini declares that the minimum agreed price was memorialized in e-mails between De Nadai and M&R.  See id.  White declares, however, that there were no fixed or minimum prices for the 9 kg. boxes.  See White Dec. ¶ 9.  Raden testified that he did not recall whether any minimum price was established for the 9 kg. consignment loads, but that a seller in Trinity's position has an obligation to achieve the best possible market price.  PUMF 14.  However, Raden also testified that the price per box which appears on the 9 kg. box consignment orders was a "theoretical price."  PUMF 13.  Similarly, after acknowledging that the 9 kg. boxes were on consignment, Raden testified that the term "consignment" meant to him that the receiver sells the product at the best price it can get, deducts its costs, and returns the net amount that is left after deductions to the shipper.  See Raden Depo. 76:7-25.  Raden testified that M&R's invoice

1  amounts (found in the third column of the invoices) were of "no moment" because Trinity did not

2  agree to buy the fruit at an agreed price.  See id. at 77:7-78:11.

3      On December 30, 2008, Trinity (through Maria Alaniz ("Alaniz")) sent an e-mail to Raden

4  objecting to the prices listed on the pro forma invoices and stating that the pricing was in excess of

5  the real market in the United States.  See White Dec. ¶ 14; Trinity Ex. B at Bates No. 000065.  On

6  the same day, and in apparent response to Trinity's e-mail, De Nadai stated in part that as to 42'

7  and 45' kiwis, "as I told you by phone, not any price is low enough, cause there is a stock of these

8  sizes, so we can discuss an espected [sic] return wk by wk."  Trinity Ex. B at Bates No. 000064.

9  De Nadai also stated in part, "I do not see major problems for landed and traveling centers for

10 General Market, as returns will be on line with all other receivers, regardless of how low they will

11 be. . . .  All the deal you can find on the market by now will significantly decrease or disappear in

12 2-3 wks . . . so I can try to get maximum support to you on current January shipments, but no

13 guarantee and no fixed prices from now up to the end of the season, it is not reasonable and then I

14 will not push for it, it wouldn't succeed."  Id.  Also, on January 2, 2009, Raden sent an e-mail to

15 Trinity that purports to confirm a conversation with Trinity.  See Trinity Ex. B at Bates No. 0098.

16 Under a heading called "East and West Coast General Market Loads," Raden wrote, "These loads

17 will be on open consignment to Trinity.  It is agreed that the Trinity margin will be 8%."  Id.

18     On January 5, 9, 14, 20, and 28, eight containers of kiwi were received by Trinity in either

19 California or New Jersey.[3]  See White Dec. ¶ 10.  The 9 kg. containers each had corresponding pro

20 forma invoices.  See Martini Dec. ¶¶ 10, 11, 14, 15, 18, 19, 22, 23, 26, 27.  Martini declares that

21 each of the pro forma invoices include a price per box, which is the alleged minimum price agreed

22 per box.  See id. at ¶ 11, 15, 19, 23, 27.  Of the shipments of M&R kiwis that were inspected by

23 the USDA, all but one received a grade of Number 1.  See PUF 32.[4]  Only one container (Order

24 No. 12) failed USDA inspection, which had average defects of 9%.  See PUF 34.  However, each

25

26 [3] The ninth container, which is Order No. 46, was bound for New Jersey.  See Martini Dec. Ex. A10; White Dec. ¶ 10.
   This container appeared to be marked for sale to Sam's Club.  See Martini Dec. Ex. A10.  It is unknown when the
   container was actually received.

27

28 [4] No USDA inspection report is available for Order No. 46.  See PUF 33.  Trinity denies PUF 34 by stating that all
   shipments of kiwis had product defects.  However, this does not actually dispute that all but one of the shipments
   received a grade of Number 1 by the USDA.      4

of the USDA reports did indicate some degree of decay.  See Trinity Ex. B at Bates Nos. 000073-000080.  Additionally, on February 16, 2009, and February 20, 2009, Trinity sent e-mails to Raden and De Nadai regarding severe damage to Order No. 30.  See Trinity Ex. B at Bates Nos. 000106-000114.  On February 20, 2009, Trinity sent another e-mail to Raden and De Nadai that M&R's kiwis were not holding up well in storage, and that Trinity had been telling De Nadai and Raden this "from the beginning."  See id. at Bates No. 000116.

Trinity marketed and sold the kiwis, accounted to M&R for its handling of all loads, and submitted the net returns to M&R, which were accepted by M&R.  See White Dec. ¶ 19. However, Martini was concerned over the returns that Trinity was paying M&R for the kiwis because Martini believed that the returns were far below what they should have been, given the price of kiwis at the time.  See Martini Dec. ¶ 41.  The market prices for kiwis at Los Angeles for January 2009 appear to be higher than M&R's alleged minimum prices for the 9 kg. containers.[5] See PUF 16.  Martini reviewed liquidation reports, but did not believe that the liquidation reports explained what he believed to be the low returns.  See Martini Dec. ¶ 41.  In some instances, there were up to 3 liquidation reports, and sometimes the reports were unclear and appeared to be inconsistent with each other.  See PUF 18.[6]  In Raden's words, "in some instances, there were one, two, and three liquidation reports before we got the accurate thing, and in some cases we never did."  PUMF 19.  M&R never received a satisfactory explanation was to why the returns were so low.  PUF 20.

## SUMMARY JUDGMENT FRAMEWORK

Cross motions for summary judgment are evaluated separately under the same standards that apply to single summary judgment motions.  See Pintos v. Pacific Creditors Ass'n, 565 1106, 1111 (9th Cir. 2009); ACLU v. City of Las Vegas, 466 F.3d 784, 790 (9th Cir. 2006).  Summary

---

[5] Raden testified, however, that market price did not necessarily mean that that was the price for which Trinity was obligated to sell M&R's kiwis.  See Raden Depo. 79:20-24.

[6] Trinity disputes PUF 18 be referencing Paragraph 19 of White's declaration.  However, Paragraph 19 in relevant part only states that Trinity properly sold and marketed the kiwis and accounted to M&R for Trinity's handling of the kiwis.  See White Dec. ¶ 19.  Paragraph 19 contains no information whatsoever about liquidation reports.  PUF 18 is not genuinely disputed.

judgment is appropriate when it is demonstrated that there exists no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56; Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970); Fortyune v. American Multi-Cinema, Inc., 364 F.3d 1075, 1080 (9th Cir. 2004).  The party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and of identifying the portions of the declarations (if any), pleadings, and discovery that demonstrate an absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Soremekun v. Thrifty Payless, Inc., 509 F.3d 978, 984 (9th Cir. 2007).  A fact is "material" if it might affect the outcome of the suit under the governing law.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986); United States v. Kapp, 564 F.3d 1103, 1114 (9th Cir. 2009).  A dispute is "genuine" as to a material fact if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party.  Anderson, 477 U.S. at 248; Freecycle Sunnyvale v. Freecycle Network, 626 F.3d 509, 514 (9th Cir. 2010).

Where the moving party will have the burden of proof on an issue at trial, the movant must affirmatively demonstrate that no reasonable trier of fact could find other than for the movant. Soremekun, 509 F.3d at 984.  Where the non-moving party will have the burden of proof on an issue at trial, the movant may prevail by presenting evidence that negates an essential element of the non-moving party's claim or by merely pointing out that there is an absence of evidence to support an essential element of the non-moving party's claim.  See James River Ins. Co. v. Herbert Schenk, P.C., 523 F.3d 915, 923 (9th Cir. 2008); Soremekun, 509 F.3d at 984.  If a moving party fails to carry its burden of production, then "the non-moving party has no obligation to produce anything, even if the non-moving party would have the ultimate burden of persuasion."  Nissan Fire & Marine Ins. Co. v. Fritz Cos., 210 F.3d 1099, 1105-06 (9th Cir. 2000).  If the moving party meets its initial burden, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually exists.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986); Nissan Fire, 210 F.3d at 1103.  The opposing party cannot "'rest upon the mere allegations or denials of [its] pleading' but must instead produce evidence that 'sets forth specific facts showing that there is a genuine issue for trial.'"  Estate of Tucker v. Interscope

6

1    Records, 515 F.3d 1019, 1030 (9th Cir. 2008).

2          The opposing party's evidence is to be believed, and all justifiable inferences that may be

3    drawn from the facts placed before the court must be drawn in favor of the opposing party.  See

4    Anderson, 477 U.S. at 255; Matsushita, 475 U.S. at 587; Narayan v. EGL, Inc., 616 F.3d 895, 899

5    (9th Cir. 2010).  While a "justifiable inference" need not be the most likely or the most persuasive

6    inference, a "justifiable inference" must be rational or reasonable.  See Narayan, 616 F.3d at 899.

7    "If conflicting inferences may be drawn from the facts, the case must go to the jury."  Holly D. v.

8    Cal. Inst. of Tech., 339 F.3d 1158, 1175 (9th Cir. 2003).  Inferences are not drawn out of the air,

9    and it is the opposing party's obligation to produce a factual predicate from which the inference

10   may be drawn.  See Sanders v. City of Fresno, 551 F.Supp.2d 1149, 1163 (E.D. Cal. 2008); UMG

11   Recordings, Inc. v. Sinnott, 300 F.Supp.2d 993, 997 (E.D. Cal. 2004).  "A genuine issue of

12   material fact does not spring into being simply because a litigant claims that one exists or

13   promises to produce admissible evidence at trial."  Del Carmen Guadalupe v. Agosto, 299 F.3d

14   15, 23 (1st Cir. 2002); see Bryant v. Adventist Health System/West, 289 F.3d 1162, 1167 (9th Cir.

15   2002).  Further, a "motion for summary judgment may not be defeated . . . by evidence that is

16   'merely colorable' or 'is not significantly probative.'"  Anderson, 477 U.S. at 249-50; Hardage v.

17   CBS Broad. Inc., 427 F.3d 1177, 1183 (9th Cir. 2006). If the nonmoving party fails to produce

18   evidence sufficient to create a genuine issue of material fact, the moving party is entitled to

19   summary judgment.  Nissan Fire, 210 F.3d at 1103.

20

21                                    **PLAINTIFF'S MOTION**

22        *Plaintiff's Argument*

23        M&R argues that it is entitled to summary judgment on its breach of contract claims.

24   Under the CISG, the elements for breach of contract are formation of a contract, performance of a

25   contract, breach of contract, and resulting damages.  Here, there was a formation of contracts for

26   the sale of kiwis, and the contracts were memorialized in order e-mails.  M&R performed by

27   shipping the amounts of kiwi indicated in the orders.  Trinity accepted the kiwis and partially

28   performed by paying M&R in partial satisfaction of the judgment.  Trinity breached the contract

by not failing to pay the full contract prices.  The difference between the full contract prices and the amounts actually paid by Trinity represent M&R's damages.  Each of the shipments of kiwis were accompanied by a pro forma or final invoice that stated the price for each size of kiwi. Trinity did not contest the amount.  The CISG permits enforcement of a party's subjective intent when the other party knows of the subjective intent and does not oppose it.  The invoices were an indication of M&R's subjective intent for a minimum price, and Trinity's silence in the face of the invoices is sufficient to constitute consent to the minimum price term.

Alternatively, even if the Court concludes that the 9 kg. boxes were not subject to a minimum price, Trinity still breached the contract.  Trinity has argued that the 9 kg. boxes were consignments and that significant quantities of the kiwis decayed before Trinity could sell them. Although the CISG does not address consignments as a form of contract, Art. 55 and Art. 79 have relevance.  Art. 55 states that when a valid contract does not expressly or implicitly fix a price, the parties are considered to have made reference to the price generally charged at the time the contract was concluded.  Art. 79 states that a party is not liable for breach if he proves that the failure was due to an impediment beyond his control.  Thus, Trinity has the burden of proving the amount of kiwis that were unsellable due to decay in order to justify the amount it remitted to M&R.  The liquidation reports are no longer in M&R's possession and Trinity has produced none. That leaves only the USDA inspection reports.  Using the USDA inspection reports and the USDA market reports for January 2009 for the price of kiwis, damages can be calculated accordingly.

If the CISG does not govern the transaction, and instead California law governs, the result under California law would be the same as utilizing CISG's Arts. 55 and 79.  Under California Food & Agriculture Code § 56279, the commission merchant (which would be Trinity) has the burden to prove the correctness of any accounting.

As for damages, based on a summary of the invoices, M&R is entitled to at least $128,931.80, which is based on the amounts received versus the minimum price.  If Trinity persists in contending that the transactions were consignments, then the damages are greater because the market price for kiwis in January 2009 was greater than M&R's minimum price. Using the market price, the balance owed would be $175,083.48.  Additionally, because the CISG

8

1  is a federal law, M&R is entitled to pre-judgment interest.  The proper amount of pre-judgment

2  interest for $175,083.48 is $8,558.09.

3      In reply, M&R argues that, there has been sufficient notice of its claims against Trinity, not

4  only in the FAC, but also through discovery.  Trinity knew that M&R was claiming that money

5  was owed for the kiwis.  Trinity has been aware of the consignment versus sales issues because

6  Trinity raised the issue in answer to the FAC.  In responding to an allegation regarding "each sale

7  transaction," Trinity answered that it admits it "received fruit from Plaintiff on consignment in

8  2009."  Further, when the parties deposed Raden, Raden was not aware that a minimum price was

9  involved, and as far as Raden and Trinity were concerned, the transactions were consignments.

10  The issue of consignment versus sale is not a surprise to Trinity.

11      As to the applicability of the CISG, cases recognize that the CISG applies to consignment

12  transactions.  Moreover, the CISG is not designed to strictly control the dealings of treaty

13  members, but to provide parties leeway to conduct their business and enforce their intent.  Both

14  the CISG and California law place the burden on Trinity to show that decay justified the low

15  prices obtained for the kiwis, and California and PACA would both look to the acceped market

16  rates to determine damages.

17      As for the statute of limitations, this case involves oral agreements that were memorialized

18  in writings.  Thus, a 4-year limitations period applies.  Also, the transactions between M&R and

19  Trinity were book accounts, and M&R also stated the amount owing on that account, which gives

20  rise to a claim for an "account stated."  If an account is sent to the debtor, and the debtor does not

21  object to it within a reasonable time, his acquiescence will be taken as an admission that the

22  account is truly stated.  A book account is open when the debtor has made some payment on the

23  account, but leaves a balance due.  A common count, such as a book account or account stated, is

24  proper when there is an indebtedness for a sum certain for the value of goods furnished, whether

25  the original transaction was an express contract or a quasi-contract.  M&R has alleged, and the

26  facts demonstrate, that the common counts for a book account and an account stated apply to this

27  case.  The applicable limitations period is 4-years for these common counts.  Also, Trinity's

28  reliance on PACA to argue that the limitations period began to run 10 days after receipt of the

1  kiwis is not availing because M&R is not proceeding under PACA.  PACA was meant to provide

2  an additional remedy, not to abridge others.  Additionally, if the transactions are consignments,

3  then it is impossible to know when Trinity sold the kiwis because Trinity no longer has the

4  liquidation reports.  However, evidence does exist as to when M&R sent the last invoice, which

5  was March 31, 2009.  Under California Civil Code § 337, when an account stated is based upon an

6  account of more than one item, the limitations period begins to run from the date of the last item.

7  Finally, M&R's claim did not accrue under the California discovery rule until it became

8  reasonably clear that M&R and Trinity would not be able to resolve their dispute about the amount

9  due.  This realization did not occur until, at the earliest, after March 31, 2009, when Raden sent an

10  e-mail to Trinity that recapped meetings about amounts owed.  Raden's e-mail shows that the

11  parties were still discussing the results of the 2008-2009 transactions and it had not become clear

12  that Trinity was not going to pay.  This lawsuit was timely filed prior to March 31, 2013.

13         As for translated documents, there are numerous documents that are not in Italian, and the

14  universal numbers in the Italian documents are understood.  Trinity offers no contradictory

15  interpretations of any material fact, nor does it identify any translation with which it disagrees.

16  Martini's declaration explains a limited number of terms and is sufficient to meet the standards for

17  translations under the Federal Rules.

18         Finally, as to the whether Trinity is the proper entity, both Trinity (i.e. Trinity Fruit Sales

19  Company) and Trinity Fruit Company have the same address and same agent for service.  The

20  shipping documents, USDA inspection reports, and various e-mails, including e-mails sent by

21  Maria Alaniz of Trinity, all bear the name Trinity Fruit Sales.  Thus, Trinity is the proper

22  defendant.  Alternatively, because Trinity Fruit Company has by its appearance in the action and

23  argument in opposition to this motion made a judicial admission that it is the proper entity to

24  respond to M&R's claims, any judgment in favor of M&R should be jointly and severally against

25  Trinity Fruit Sales Company and Trinity Fruit Company.

26         *Defendant's Opposition*

27         Trinity opposes M&R's motion and counter-moves for summary judgment.  Trinity argues

28  that the FAC alleges that the transactions between M&R and Trinity were direct sales, but the

1   evidence shows that the transactions were consignments.  A consignment is not a sale, rather it is

2   in the nature of a service.  Because the CISG covers international sales of goods, it is not

3   applicable to this case.  All of M&R's arguments that rely on the CISG are therfore irrelevant.

4   Although M&R's motion addresses recovery under a consignment theory, the FAC does not allege

5   that the transactions were consignments or seek recovery under a consignment theory.  Further,

6   M&R's motion relies in part on documents that are in the Italian language.  The documents are not

7   translated into English by any person shown to be a competent translator.  Thus, the documents

8   are not admissible and cannot be considered.

9           Trinity also argues that, even if M&R had viable causes of action against Trinity, the

10  statute of limitations bars many, if not all, of those claims.  The consignment agreements were oral

11  contracts.  Under California law, the statute of limitations for an oral contract is 2 years.  The

12  transactions at issue all occurred in January 2009.  However, M&R did not file suit until February

13  25, 2013, which is well beyond two years.  Alternatively, the statute of limitations under the CISG

14  and California law for written contracts is 4 years.  The FAC alleges that payments were due on

15  eleven dates, ranging from January 19, 2009 to August 30, 2009.  However, there are no

16  allegations that specify when the contracts were made, when payments were due, or when net

17  payments were received, so it is difficult to determine precisely when the statute began to run.

18  Nevertheless, six of the alleged due dates were prior to February 25, 2009, and would be barred by

19  the 4-year limitation period.  Moreover, under 7 U.S.C. § 499, the Perishable Agricultural

20  Commodities Act ("PACA"), payment is due 10 days after receipt and acceptance.  All of the

21  containers at issue were received between January 5, 2009, and January 28, 2009.  Ten days from

22  January 28 would be February 7, 2009.  Four years from February 7, 2009 is February 7, 2013,

23  which predates the February 25, 2013 filing date in this case.

24          Finally, Trinity argues that it is not the proper defendant.  Trinity is the named defendant,

25  but Trinity Fruit Company is the proper defendant.  Trinity Fruit Sales Company and Trinity Fruit

26  Company are separate corporate entities with separate corporate and entity numbers.  Because

27  Trinity Fruit Sales Company is not the entity that did business with M&R, it can have no liability

28  to M&R.

In sur-reply, Trinity argues that PACA applies to all interstate and foreign produce transactions. Although M&R may not choose to avail itself of the various PACA protections, it cannot preclude application of PACA from the transaction at issue. Further, M&R relies on inapposite cases to argue that the CISG applies to consignment transactions.

As for the statute of limitations, M&R agrees that the transactions were pursuant to oral agreement, but that they were memorialized, presumably by invoices. However, invoices and confirmations of sale do not represent a contract between the parties. Because M&R agrees that the transactions were pursuant to oral agreements, the 2-year limitations period applies.

With respect to the book account and account stated causes of action, those claims do not preclude summary judgment. In order to have a claim for an account stated, there must be assent by the parties to the amount owed. There is no assent. M&R's contention that there was no objection, and therefore assent, is conclusory and unsupported by facts in the record. Also, a debt that is predicated upon the breach of the terms of an express contract cannot be the basis of an account stated or a book account. Further, an action for breach of an oral contract cannot be resurrected by alleging either a book account or an account stated. Because the consignment agreement in this case was an express oral agreement, the 2-year limitations period applies and cannot be extended to 4 years through reliance on common counts.

### *Discussion*

1.    First Cause of Action – Violation Of The CISG

"The CISG is an international treaty that governs the formation of international sales contracts as well as the rights and obligations of the parties." Genpharm Inc. v. Pliva-Lachema A.S., 361 F.Supp.2d 49, 53-54 (E.D. N.Y. 2005). The CISG applies to "contracts of sale of goods between parties whose places of business are in different States . . . when the States are Contracting States." BP Oil Int'l, Ltd. v. Empresa Estatal Petroleos de Ecuador, 332 F.3d 333, 336 (5th Cir. 2003); Chateau Des Charmes Wines LTD. v. Sabate USA Inc., 328 F.3d 528, 530 (9th Cir. 2003). The CISG "governs only the formation of the contract of sale and the rights and obligations of the seller and the buyer arising from such a contract." CISG Art. 4. The CISG "does not apply to contracts in which the preponderant part of the obligations of the party who

1  furnishes the goods consists in the supply of labor or other services."  CISG Art. 3(2).  The

2  CISG's provisions are interpreted by looking to the CISG's express language and to "the general

3  principles" upon which the CISG is based.  See CISG Art. 7(2); Dingxi Longhai Dairy, Ltd. v.

4  Becwood Tech. Group L.L.C., 635 F.3d 1106, 1107 (8th Cir. 2011); Chicago Prime Packers, Inc.

5  v. Northam Food Trading Co., 408 F.3d 894, 898 (7th Cir. 2005); Delchi Carrier SpA v. Rotorex

6  Corp., 71 F.3d 1024, 1027-28 (2d Cir. 1995).  The CISG directs courts to be mindful of "its

7  international character and . . . the need to promote uniformity in its application and the

8  observance of good faith in international trade."  CISG Art. 7(1); Forestal Guarani S.A. v. Daros

9  Int'l, Inc., 613 F.3d 395, 398 (3d Cir. 2010).  "The CISG strives to promote certainty among

10  contracting parties and simplicity in judicial understanding by (1) reducing forum shopping, (2)

11  reducing the need to resort to rules of private international law, and (3) establishing a law of sales

12  appropriate for international transactions."  Forestal Guarani, 613 F.3d at 398.  Further, the "CISG

13  is the international analogue to Article 2 of the Uniform Commercial Code."  Chicago Prime, 408

14  F.3d at 898.  Thus, "caselaw interpreting analogous provisions of Article 2 of the [UCC], may . . .

15  inform a court where the language of the relevant CISG provision tracks that of the UCC."  Dingxi

16  Lonhai Dairy, 635 F.3d at 1107; Chicago Prime, 408 F.3d at 898; Delchi Carrier, 71 F.3d at 1028.

17  "However, UCC caselaw is not per se applicable."  Chicago Prime, 408 F.3d at 898.

18  　　　The parties do not dispute that both the United States and Italy are signatory nations to the

19  CSIG.  See Delchi Carrier, 71 F.3d at 1027.  Instead, the parties dispute whether the CSIG applies

20  to the transactions involved in this case.  There are two issues entailed in this dispute:  whether the

21  transactions between M&R and Trinity were consignments, and if so, whether consignment

22  transactions are covered by the CISG.  The Court will address these issues separately.

23  　　　　　a.　　Nature of the Agreement/Transactions

24  　　　"In ordinary commercial practice, a consignment is nothing more than a bailment for care

25  or sale, wherein there is no obligation of purchase in the consignee."  In re D. I. A. Sales Corp.,

26  339 F.2d 175, 178 (6th Cir. 1964).  "A true consignment creates an agency pursuant to which

27  goods are delivered to a dealer for the purpose of resale; the consignor usually requires the

28  　　　　　　　　　　　　　　　　　13

1  consignee to charge a certain price for the goods."[7] <u>Glenshaw Glass Co. v. Ontario Grape</u>

2  <u>Growers' Mktg. Bd.</u>, 67 F.3d 470, 475 (3d Cir. 1995); <u>see</u> Black's Law Dictionary at 307 (6th ed.

3  1990) (defining "consignment" in part to mean "Entrusting of goods to another to sell for the

4  consignor . . . . The term 'consignment,' used in a commercial sense ordinarily implies an agency

5  and denotes that property is committed to the consignee for care or sale."). "A consignment of

6  goods for sale does not pass the title at any time, nor does it contemplate that it should be passed."

7  <u>Christopher v. SmithKline Beecham Corp.</u>, 132 S. Ct. 2156, 2169 (2012). That is, "a true

8  consignment does not effect a sale . . . ." In re Ide Jewelry Co., 75 B.R. 969, 976 (Bankr. S.D.

9  N.Y. 1987)[8]; <u>see also</u> <u>Taylor v. Wachtler</u>, 825 F.Supp. 95, 103 (E.D. Pa. 1993); <u>Jackson v. Dep't</u>

10  <u>of Justice</u>, 85 Cal.App.4th 1334, 1350 (2001) ("A consignment for sale is a form of bailment, and

11  as Witkin points out, "[a] bailment is usually clearly distinguishable from a sale."); <u>Bank of Cal. v.</u>

12  <u>Thornton-Blue Pac., Inc.</u>, 53 Cal.App.4th 841, 847 (1997).

13       As to the transactions for the 9 kg. boxes of kiwi, Trinity's president, M&R's president,

14  and Raden each have classified those transactions as "consignments" for sale on the open/general

15  market. <u>See</u> Martini Dec. ¶ 4; White Dec. ¶ 9; PUMF 12. Raden's explanation of a consignment,

16  i.e. "the receiver sells the product, subtracts their costs, and returns a net to the shipper," is

17  consistent with the legal view of a "consignment." <u>Cf.</u> Raden Depo. 76:7-25 <u>with</u> <u>Glenshaw</u>

18  <u>Glass</u>, 67 F.3d at 475; <u>Taylor</u>, 825 F.Supp. at 103; <u>In re Ide Jewelry</u>, 75 B.R. at 976; <u>Bank of Cal.</u>,

19  53 Cal.App.4th at 847. There is no argument that Trinity ever purchased the kiwis themselves,

20  nor is there an indication that Trinity did anything other than sell the kiwis to third parties and

21  remit the net proceeds to M&R. <u>See</u> White Dec. ¶¶ 12, 19. In fact, White declares without

22  contradiction that M&R did not sell kiwis directly to Trinity, nor did Trinity ever agree to

23  purchase kiwis from M&R. <u>See id.</u> at ¶ 13. Although M&R and Trinity dispute whether a

24  minimum price was required for the 9 kg. boxes, whether a minimum price was required does not

---

25  [7] "Generally, there are two types of consignments -- true consignments and security consignments." <u>Glenshaw Glass</u>,
26  67 F.3d at 475. Because neither party in this case contends that the transactions were security consignments, the
    Court will focus on "true consignments."

27  [8] The Court notes that the Ninth Circuit has cited with approval <i>In re Ide Jewelry</i>'s discussion of, and distinction
28  between, "true consignments" and "security interests." <u>See</u> United States v. Lawson, 925 F.2d 1207, 1211 (9th Cir.
    1991).

1    disqualify the transactions from being true consignments.  See Glenshaw Glass, 67 F.3d at 475

2    (noting that the consignor "usually," not always, "requires the consignee to charge a certain price

3    for the goods.").  Therefore, the transactions involving the 9 kg. boxes were consignments.

4         As to the transactions for the 14 kg. boxes of kiwis, those loads were sold to either Costco

5    or Sam's Club at a fixed price.  See Martini Dec. ¶ 4; White Dec. ¶ 9.  White declares that the 14

6    kg. boxes were consignments to Trinity, despite being subject to a fixed sale price, because Trinity

7    did not purchase the kiwis from M&R and then resell them to Costco.  See White Dec. ¶ 12.

8    Instead, Trinity handled the 14 kg. boxes on consignment and took a commission.  See id. at ¶ 12.

9    Again, White also declared that at no time did M&R sell kiwis directly to Trinity, nor did Trinity

10   ever agree to purchase kiwis from M&R.  See id. at ¶ 13.  M&R cites no evidence that refutes

11   White's assertions.  Without more from M&R, there is no evidence to suggest that Trinity directly

12   purchased the 14 kg. boxes from M&R.  Rather, the evidence shows that Trinity sold the 14 kg.

13   boxes at a fixed price to Costco or Sam's Club, took a commission, and remitted the net to M&R.

14   See White Dec. ¶¶ 12, 13, 19; cf. Glenshaw Glass, 67 F.3d at 475; Taylor, 825 F.Supp. at 103; In

15   re Ide Jewelry, 75 B.R. at 976; Bank of Cal., 53 Cal.App.4th at 847.  Therefore, the Court

16   concludes that the transactions involving the 14 kg. boxes were consignments.  See id.

17        In sum, the evidence shows that the transactions between M&R and Trinity for both the 9

18   kg. and 14 kg. boxes were consignments, not sales of kiwis from M&R to Trinity.[9]

19             b.    Consignments & The CISG

20        M&R has cited two cases for the proposition that the CISG applies to consignment

21   transactions:  Treibacher Industrie, A.G. v. Allegheny Techs., Inc., 464 F.3d 1235 (11th Cir. 2006)

22   and In re San Lucio, 2009 U.S. Dist. LEXIS 31681 (D. N.J. Apr. 15, 2009).

23        In Treibacher Industrie, Treibacher agreed to supply TDY Industries with a metal powder

24   "for delivery to 'consignment.'"  Treibacher, 464 F.3d at 1236.  The parties disputed the meaning

25   of the term "consignment."  Id. at 1236-37.  TDY presented expert testimony that the term

26   "consignment" in the metal industry meant that no sale occurred unless and until TDY actually

27

28   ─────────────────
[9] The Court notes that classifying the transactions for the 9 kg. boxes and the 14 kg. boxes as "consignments" is
consistent with the parties' 2007 transaction.  As discussed above, in 2007 Trinity sold M&R's kiwis on consignment.
See White Dec. ¶¶ 5, 6.

1   used the metal powder.  See id. at 1237.  In contrast, Treibacher presented evidence that through

2   their course of conduct, the parties understood "consignment" to mean TDY had a binding

3   obligation to pay for all of the metal powder specified in each contract, but Treibacher would

4   delay billing TDY for the powder until TDY had actually used the powder.  Id. at 1237.  The

5   District Court held that, under the CISG, the parties' prior practice and understanding was the

6   proper meaning of the term "consignment," and the recognized industry understanding of the term

7   "consignment" was not applicable.  See id.  The Eleventh Circuit affirmed the District Court and

8   found that using the parties' understanding and prior practice to define "consignment" was

9   appropriate under the CISG.  See id. at 1240.

10         The Court does not find *Treibacher* controlling.  Although the term "consignment" is used

11   in the opinion, the description of those transactions do not demonstrate "true consignments."  The

12   dispute was whether a specific industry's understanding of the term "consignment," or instead the

13   parties' alleged specific usage/understanding of the term "consignment," should apply.  Neither of

14   the possible meanings was akin to a "true consignment."  Instead, what is described is a kind of

15   delayed sale of the metal powder from Treibacher directly to TDY.  It was TDY who actually paid

16   for and consumed the metal powder.  There is no indication that once TDY received the metal

17   powder, it then sold the metal powder to another party and remitted the net funds to Treibacher.

18   Additionally, there does not appear to have been any argument or contention that the CISG did not

19   apply to the transaction.  Rather, TDY argued on appeal that under the CISG, it was the industry

20   understanding of a term that should control instead of the parties' specific usage or understanding.

21   In the case at bar, there is a true consignment involved and the parties have disputed whether the

22   CISG applies.  Accordingly, *Treibacher* does not apply to this case.

23         As for *In re San Lucio*, that case appears to involve true consignments of cheese made in

24   Italy and sold in the United States.  See In re San Lucio, 2009 U.S. Dist. LEXIS 31681 at *2*-*3.

25   However, both parties agreed that the CISG applied, and only disputed the issues of the

26   availability and amount of prejudgment interest and attorney's fees under the CISG.  See In re San

27   Lucio, 2009 U.S. Dist. LEXIS 31681 at *3-*4, *7.  Because the parties were in agreement as to

28   the applicability of the CISG, the District Court understandably conducted no analysis about

16

1   whether consignments were actually covered by the CISG.  In contrast, the parties in this case do

2   not agree on the CISG's applicability to true consignments.  Without an actual analysis of whether

3   the CSIG applies to consignments, the Court cannot rely on *San Lucio* to resolve the issue.

4   Aside from *Treibacher* and *In re San Lucio*, the parties have cited no cases that deal with

5   consignment transactions.  The Court's own research has revealed no cases that address whether

6   true consignment transactions are covered by the CISG.  Without any cases on point, the Court

7   will be guided by the language of the CISG, the purposes behind the CISG, and Article 2 of the

8   UCC.  See Forestal Guarani, 613 F.3d at 398; Chicago Prime, 408 F.3d at 898.

9   In terms of the CISG's language, the CISG expressly states that it "applies to contracts of

10  sale of goods . . . ."  CISG Art. 1.  The CISG does not define the term "sale."  However, the UCC

11  does define the term "sale."  Under the UCC, a "sale" consists of "the passing of title from the

12  seller to the buyer for a price."  U.C.C. § 2-106(1) (1977); Seney v. Rent-A-Center, Inc., 738 F.3d

13  631, 636 (4th Cir. 2013); Classic Concepts, Inc. v. Linen Source, Inc., 2006 U.S. Dist. LEXIS

14  96767, *49 (C.D. Cal. Apr. 26, 2006).  Because a "consignment of goods for sale does not pass the

15  title at any time," Christopher, 132 S. Ct. at 2169; see also Glenshaw Glass, 67 F.3d at 475; In re

16  Ide Jewelry, 75 B.R. at 976, a consignment between the consignor and consignee does not appear

17  to fit within the definition of a "sale."  Also, the CISG states that it "governs only the formation of

18  the contract of sale and the rights and obligations of the seller and the buyer arising from the

19  contract."  CISG Art. 4.  District Courts have read CISG Art. 4 to exclude "from the scope of the

20  CISG the rights and obligations of all parties that are neither the immediate buyer nor the

21  immediate seller."  Beth Schiffer Fine Photographic Arts, Inc. v. Colex Imaging, Inc., 2012 U.S.

22  Dist. LEXIS 36695, *19 (D.N.J. Mar. 19, 2012) (and cases cited therein).  In comparison to UCC

23  Art. 2, one Court has held that because a "true consignment" does not effect a sale as between the

24  consignor and the consignee, "those provisions of Article 2 of the U.C.C. relating to 'buyers' and

25  'sellers' do not apply to true consignments."  In re Ide Jewelry, 75 B.R. at 976. *Beth Schiffer* and

26  *In re Ide Jewelry* suggest that true consignments are not covered by the CISG because they are not

27  contracts between "buyers" and "sellers."

28  The term "consignment" does appear one time in the CISG.  Under Chapter II (entitled

17

1    "Obligations Of The Seller"), Section I ( "Delivery of the Goods and Handing Over Documents"),

2    the CISG in pertinent part reads:  "If the seller, in accordance with the contract or this Convention,

3    hands the goods over to a carrier and if the goods are not clearly identified to the contract by

4    markings on the goods, by shipping documents or otherwise, the seller must give the buyer notice

5    of the consignment specifying the goods."  CSIG Art. 32(1).  If the seller does not clearly identify

6    the goods by either marking the goods, by shipping documents, or by notice to the buyer when the

7    goods are transferred for carriage to the buyer, then the risk of loss does not pass to the buyer.  See

8    CSIG Art. 67.  The context and language of Art. 32(1) shows that it is meant to impose obligations

9    on a seller who is shipping goods to a buyer.  The obligations are placed on the seller by Art.

10   32(1), and the consequences for not fulfilling those obligations are found in Art. 67.  Those

11   consequences are between the buyer and the seller, not the seller and the carrier.  Under Art. 32(1),

12   there remains a direct sale between a seller and buyer.  Therefore, the "consignment" identified in

13   Art. 32(1) is not the transaction between the buyer and the seller, but is the transaction between the

14   seller and the carrier.  See John O. Honnold, Uniform Law for International Sales under the 1980

15   United Nations Convention, § 213 pp. 245-47 (3rd ed. 1999).  Article 32(1) does not purport to set

16   any obligations between a consignor and a consignee.

17         "To the extent they are not 'displaced by any particular provision of the' UCC, true

18   consignments are 'governed by the principles of agency.'"  In re Ide Jewelry, 75 B.R. at 974

19   (quoting Manger v. Davis, 619 P.2d 687, 692 (Utah 1980)).  The term "consignment" appears one

20   time in UCC Art. 2.  Section 2-326(3) covers "Consignment Sales and Rights of Creditors."  In

21   pertinent part, UCC § 2-326 reads:

22             Where goods are delivered to a person for sale and such person maintains a place of
             business at which he deals in goods of the kind involved, under a name other than
23             the name of the person making delivery, then with respect to claims of creditors of
             the person conducting the business the goods are deemed to be on sale or return.
24             The provisions of this subsection are applicable even though an agreement purports
             to reserve title to the person making delivery until payment or resale or uses such
25             words as "on consignment" or "on memorandum."

26   U.C.C. § 2-326(3).  The Official Comment to this section explains in part:

27             Pursuant to the general policies of this Act which require good faith not only
             between the parties to the sales contract, but as against interested third parties,
28             subsection (3) resolves all reasonable doubts as to the nature of the transaction in

                                                    18

> favor of the general creditors of the buyer. As against such creditors words such as "on consignment" or "on memorandum", with or without words of reservation of title in the seller, are disregarded when the buyer has a place of business at which he deals in goods of the kind involved. A necessary exception is made where the buyer is known to be engaged primarily in selling the goods of others or is selling under a relevant sign law, or the seller complies with the filing provisions of Article 9 as if his interest were a security interest.

American Law Inst., Uniform Commercial Code 1962, § 2-326, Official Text with Comments.  As per the language of the section and the official comment, the "purpose of UCC § 2-326 is to protect creditors of a consignee of goods from hidden liens."  Cantor v. Anderson, 639 F.Supp. 364, 369 n.8 (S.D. N.Y. 1986).

A similar term to "consignment" found in UCC Art. 2 is the term "entrusting."  Sections 2-403(2), (3) covers "entrusting" transactions.  Those sections read:

> (2) Any entrusting of possession of goods to a merchant who deals in goods of that kind gives him power to transfer all rights of the entruster to a buyer in ordinary course of business.

> (3) "Entrusting" includes any delivery and any acquiescence in retention of possession regardless of any condition expressed between the parties to the delivery or acquiescence and regardless of whether the procurement of the entrusting or the possessor's disposition of the goods have been such as to be larcenous under the criminal law.

UCC § 2-403(2), (3).  These provisions establish limited circumstances in which a person who does not actually have title to goods may nevertheless transfer title to another.  In re Ide Jewelry, 75 B.R. at 976 n.1.  The Official Comment to UCC § 2-403 explains, "The many particular situations in which a buyer in ordinary course of business from a dealer has been protected against reservation of property or other hidden interest are gathered by subsections (2)-(4) into a single principle protecting persons who buy in ordinary course out of inventory."  American Law Inst., Uniform Commercial Code 1962, § 2-403, Official Text with Comments.  In other words, UCC §§ 2-403(2), (3) are intended to protect a person who buys an "entrusted" good against claims by the "entrustor."

The parties have not addressed  UCC Art. 2, and no clear analog between the CISG and UCC §§ 2-326(3) or 2-403(2), (3) are apparent.  Assuming for the sake of argument that these UCC sections are useful to interpreting the CISG, contra Dingxi Lonhai Dairy, 635 F.3d at 1107 (holding that case law interpreting analogous portions of the UCC may be consulted in

19

1  interpreting the CISG), the consignment transactions described by the UCC are not present in this

2  case. This case does not involve creditors of Trinity who are trying to take M&R's kiwis, cf. UCC

3  § 2-326(3), nor does this case involve M&R attempting to get back kiwis that Trinity sold to a

4  third party. See UCC § 2-403(2). The true consignments at issue in this case appear to be outside

5  of the scope of UCC Art. 2. See In re Georgetown Steel Co., LLC, 2004 Bankr. LEXIS 2393,

6  *40-*41 (Bankr. D. S.C. Dec. 3, 2004) (holding that because parties structured the transaction as a

7  consignment and not a sale, they were outside the realm of UCC Art. 2); In re Ide Jewelry, 75 B.R.

8  at 974-77. This suggests that they are also outside the scope of the CISG.

9       Finally, in terms of the objectives behind the CISG, the parties do not address this

10  consideration. One objective of the CISG is to develop a uniform understanding of its provisions.

11  See CISG Art. 7(1); Forestal Guarani, 613 F.3d at 398. This Court is aware of no judicial

12  decisions that address the applicability of the CISG to true consignments. However, the CISG is

13  limited by its provisions. See CISG Arts. 1(1), 4; see also Delchi Carrier, 71 F.3d at 1028. If a

14  transaction falls outside of the scope of the CISG, even if the transaction may have some kind of

15  relationship to an international "sale" of goods, then the CISG does not apply. See, e.g., Beth

16  Schiffer, 2012 U.S. Dist. LEXIS 36695 at *19; Gibraltar Trading Corp. v. PMC Specialties Grp.,

17  Inc., 851 F.Supp.2d 437 (E.D. N.Y. 2011). As discussed above, because a true consignment

18  between a consignor and a consignee is not a sale between a buyer and seller, true consignments

19  appear to be outside the scope of the CISG. Holding that the CISG does not cover true

20  consignment transactions would help to further define the term "sale," and would continue the

21  recognition that the CISG is not unlimited in its scope.

22          c.   Conclusion

23       The transactions between M&R and Trinity for the 9 kg. and 14 kg. boxes of kiwi are true

24  consignments. A true consignment is in the nature of a bailment; it is not a sale in which title from

25  the consignor passes to the consignee. Without more from the parties, the Court holds that the

26  CISG does not apply to true consignments. Because CISG does not apply to the consignment

27  between M&R and Trinity, summary judgment in favor of Trinity on the first cause of action is

28  appropriate.

1    <u>2.</u>      <u>Second Cause of Action -- Breach of Written Contract</u>

2         <u>a.</u>      <u>Consequences Of The FAC</u>

3         In pertinent part, the FAC alleges that M&R agreed to produce and deliver kiwis to Trinity

4    in exchange for prompt payment of the invoiced amounts, and that each of the "sale transactions

5    [between M&R and Trinity] represented a direct sale by [M&R] to Trinity for the stated amount."

6    FAC ¶¶ 33, 34.  These allegations reflect a claim based on a specific contract between M&R and

7    Trinity for a direct sale of kiwis by M&R to Trinity for an agreed upon price.  <u>See id.</u>  There is no

8    mention of any of the transactions being consignments.  <u>See id.</u> at ¶¶ 32-41.  These allegations

9    have significant consequences.

10        "Factual assertions in pleadings and pretrial orders, unless amended, are considered

11   judicial admissions conclusively binding on the party who made them."  <u>American Title Ins. Co.</u>

12   <u>v. Lacelaw Corp.</u>, 861 F.2d 224, 226 (9th Cir. 1988); <u>see also</u> <u>El Paso Natural Gas Co. v. United</u>

13   <u>States</u>, 750 F.3d 863 (D.C. Cir. 2014).  By contending in its summary judgment motion and reply

14   that it can recover under a theory that the transactions were actually consignments and not direct

15   sales, M&R is taking a position that is contrary to the FAC's allegations.  M&R is bound by the

16   allegation that the contract at issue is a contract for the direct sale of kiwis to Trinity for a fixed

17   price.  <u>See</u> <u>American Title</u>, 861 F.2d at 226.  However, as discussed above, the transactions at

18   issue are consignments, and consignments are not direct sales from the consignor to the consignee.

19   <u>See</u> <u>Christopher</u>, 132 S. Ct. at 2169; <u>In re D. I. A.</u>, 339 F.2d at 178; <u>Taylor</u>, 825 F.Supp. at 103-04;

20   <u>In re Ide Jewelry Co.</u>, 75 B.R. at 976; <u>Jackson</u>, 85 Cal.App.4th at 1350.  There is no evidence

21   before the Court that Trinity agreed to directly purchase any kiwis from M&R.  Therefore, the

22   contract described under the second cause of action does not exist.

23        Second, a plaintiff generally may not advance a new claim at the summary judgment stage.

24   <u>See</u> <u>Pickern v. Pier 1 Imps. (U.S.), Inc.</u>, 457 F.3d 963, 968-69 (9th Cir. 2006); <u>Hurlbert v. St.</u>

25   <u>Mary's Health Care Sys., Inc.</u>, 439 F.3d 1286, 1296-97 (11th Cir. 2006); <u>Coleman v. Quaker Oats</u>

26   <u>Co.</u>, 232 F.3d 1271, 1292-93 (9th Cir. 2000); <u>B-K Lighting, Inc. v. Vision3 Lighting</u>, 930 F.

27   Supp.2d 1102, 1132-33 (C.D. Cal. 2013).  If a plaintiff wishes to pursue a new claim, generally

28   the proper procedure is to file an amended complaint prior to summary judgment.  <u>See</u> <u>Hurlbert,</u>

21

1   439 F.3d at 1297; B-K Lighting, 930 F.Supp.2d at 1132.

2         Here, M&R is attempting to advance a new claim that is not found in the FAC.  As

3   discussed above, the second cause of action describes a particular contract between Trinity and

4   M&R for the direct sale of kiwis by M&R to Trinity.  See FAC ¶¶ 32-41.  However, the evidence

5   before the Court shows that the transactions are actually consignments and not direct sales.  There

6   are different obligations involved depending on whether a transaction is a sale or a consignment.

7   Under a consignment, the consignee is obligated to sell the consignor's goods at either an agreed

8   upon price or the best price possible, and then remit the net proceeds to the consignor.  See

9   Christopher, 132 S. Ct. at 2169; In re D. I. A., 339 F.2d at 178; Taylor, 825 F.Supp. at 103-04;

10   Davidson Fruit Co. v. Produce Distributors Co., 134 P. 510, 511 (Wash. 1913).  Under an

11   agreement for sale, "one party turns goods over to another and that second party sells them as his

12   own and is liable to the first party only for the purchase price."  Taylor, 852 F.Supp. at 103-04; see

13   also Kemp-Booth Co. v. Calvin, 84 F.2d 377, 381 (9th Cir. 1936).  Courts have found that

14   characterizing an agreement as a consignment may be a defense to a claim for a breach of a sale

15   agreement.  E.g. Taylor, 825 F.Supp. at 103; Davidson Fruit, 134 P. at 511; J.C. Merrill & Co. v.

16   A. Jaeger, 5 Haw. 475 (Haw. 1885).  By arguing that it is entitled to summary judgment for breach

17   of a consignment agreement, M&R in effect is attempting to recover for breach of a second

18   contract that is not found in the FAC.  This is improper.  Cf. Pickern, 457 F.3d at 968-69 (holding

19   that the plaintiff's attempt to recover for specific ADA violations that were no identified in the

20   complaint was improper); Hurlbert, 439 F.3d at 1297 (holding that the plaintiff's attempt to

21   recover for violation of the Family and Medical Leave Act for time taken to care for a family

22   member was improper where complaint only identified time taken with respect to plaintiff's own

23   medical issues).

24         It is true that Trinity raised the consignment issue in its answer.  In Trinity's answer,

25   Trinity did not admit that there were sale transactions, but instead answered that it received

26   consignments from M&R.  See Answer at ¶¶ 12, 13, 33.  However, that Trinity's answer in

27   essence denied that a direct sale agreement was involved does not mean that it had notice that

28   M&R would then attempt to recover under a consignment theory.  Nowhere in the FAC does

1    M&R allege in the alternative that Trinity breached a consignment agreement.  Rather, the FAC

2    alleges a breach of a direct sale agreement.  As the pleadings stand, the sense is that the key issue

3    is whether the agreement was a direct sale agreement or a consignment agreement, not whether

4    Trinity breached a consignment agreement.  The type of discovery involved in determining the

5    proper characterization of an agreement, i.e. a direct sales agreement or a consignment agreement,

6    would be different in many respects from the discovery involved in trying to determine whether a

7    consignment agreement was actually breached.  Cf. Coleman, 232 F.3d 1271, 1292-93 (noting that

8    the discovery involved in a disparate treatment theory is different from that involved with a

9    disparate impact theory and that permitting a plaintiff to proceed on an unpled disparate impact

10   theory improperly sandbags the defendant).  In short, that Trinity raised the consignment issue in

11   its answer does not mean that it had notice that M&R would be pursuing a breach of consignment

12   theory.  Without more from M&R, the FAC does not fairly contain a breach of consignment claim.

13          The allegations in the FAC are fatal to M&R's second cause of action.  The second cause

14   of action is based on a direct sale agreement, it is not based on a consignment agreement.  M&R is

15   bound by its allegations, and it is improper for M&R to attempt to recover on a new contract claim

16   that is not found in the FAC.  Summary judgment in favor of Trinity on this claim is appropriate.

17                          b.      Statute Of Limitations

18          Alternatively, there is a significant statute of limitations problem in that it has not been

19   established that the 4-year limitations period applies.  The 4-year limitations period applies to

20   contracts "founded upon an instrument in writing . . . ."  Cal. Civ. Code § 337.  For oral contracts,

21   the statute of limitations is 2-years.  See Cal. Civ. Code § 339.  In order for a contract to be

22   "founded on a writing," the writing must contain the relevant terms of the agreement and the

23   defendant must have "accepted" the writing.  See Amen v. Merced County Title Co., 58 Cal.2d

24   528, 532 (1962); Pietrobon v. Libarle, 137 Cal.App.4th 992, 997 (2006); E.O.C. Ord, Inc. v.

25   Kovakovich, 200 Cal. App. 3d 1194, 1201 (1988).  A defendant's acceptance may be proven in

26   various ways, including by evidence of words spoken, evidence of a particular act other than

27   signing, or evidence that the party to be charged prepared the written document and offered to

28   perform its terms.  E.O.C. Ord, 200 Cal.App.3d at 1201.  Also, the prevailing rule is that an

1    invoice, standing alone, is not a contract, and a buyer is ordinarily not bound by statements on the

2    invoice which are not a part of the original agreement.  Hebberd-Kulow Enterprises, Inc. v.

3    Kelomar, Inc., 218 Cal.App.4th 272, 283 (2013); C9 Ventures v. SVC-West, L.P., 202

4    Cal.App.4th 1483, 1501-02 (2012); India Paint Co. v. United Steel Prod. Corp., 123 Cal.App.2d

5    597, 607 (1954).  Here, M&R states that the transactions were oral agreements that were

6    memorialized.  M&R does not specifically explain how the transactions were memorialized, but

7    M&R's motion makes reference to order e-mails.  See Doc. No. 21-1 at 7:15-16.  No specific e-

8    mails are identified, but Martini's declaration indicates that the e-mails are between De Nadai and

9    Martini.  See Martini Dec. ¶ 3.  Trinity contends that M&R may be relying on M&R's invoices.

10   See Doc. No. 28 at 4:24-5:2.  However, neither De Nadai's e-mails nor the invoices adequately

11   indicate that the agreement at issue is "founded upon a writing."

12          With respect to e-mails from De Nadai, reliance on those e-mails is problematic.  There is

13   no evidence that these e-mails ever went to Trinity, nor is there evidence that De Nadai was acting

14   as an agent on behalf of Trinity when he sent the e-mails.  In fact, the only evidence before the

15   Court is that De Nadai had worked with M&R in the past, M&R paid De Nadai, and Trinity did

16   not pay De Nadai.  Although Martini declares that De Nadai's e-mails to him show a minimum

17   price for the 9 kg. boxes, there is no evidence that Trinity accepted such e-mails.  Cf. E.O.C. Ord,

18   200 Cal.App.3d at 1201.  There is insufficient evidence to support a finding that De Nadai's e-

19   mails constitute a "writing" between M&R and Trinity.  See id.

20          As for the invoices, M&R does not address the general rule that invoices are insufficient to

21   constitute a contract.  See India Paint, 123 Cal.App.2d at 607.  In the absence of additional

22   evidence or argument, all that is before the Court are Italian language invoices (the entire content

23   of which are unclear), not contracts.  See id.  Also, there is no evidence that Trinity "accepted" the

24   alleged minimum prices in the invoices.  Although M&R states that Trinity never voiced

25   objections to the prices or invoices, no evidence is cited in support of that assertion.  See Bryant,

26   289 F.3d at 1167.  However, on December 30, 2008, Alaniz sent an e-mail to Raden that stated:

27   "The prices on the invoices are premium prices, and unrealistic if they were sending to anybody

28   else.  I am very disappointed that they will not work with us on current loads knowing what the

                                              24

1    real market is in the U.S." Trinity Ex. B at Bates 000065.  White characterizes Alaniz's e-mail as

2    "objecting to the prices listed on the pro forma invoices that accompanied the shipments and

3    stating that the pricing was in excess of the real market in the United States." White Dec. ¶ 14.

4    M&R does not respond to this portion of White's declaration or Alaniz's e-mail.

5         Since there is insufficient evidence that the invoices or De Nadia's emails trigger the 4-

6    year period for written contracts, the 2-year limitations period for oral contracts applies.  There is

7    no dispute that M&R's claims accrued in 2009.  Because this case was not filed until February

8    2013, the second cause of action is time barred.  Summary judgment in favor of Trinity is proper.

9         Alternatively, even if the 4-year limitations period applies, there is a problem on the face

10   of the FAC.  Generally, a "cause of action for breach of contract accrues at the time of breach,

11   which then starts the limitations period running."  Gabriel Techs. Corp. v. Qualcomm, Inc., 857

12   F.Supp.2d 997, 1010 (S.D. Cal. 2012); Cochran v. Cochran, 56 Cal.App.4th 1115, 1120 (1997).

13   Here, the FAC alleges that Trinity breached the agreement by failing to make payment on eleven

14   dates:  1/19/09, 1/26/09, 1/27/09, 2/9/09, 2/18/09, 2/22/09, 2/28/09, 3/7/09, 3/8/09, 7/1/09, and

15   8/30/09.  See FAC ¶ 38.  These dates allegedly correspond to the due-dates on the invoices.  See

16   id.  The Original Complaint was filed in this Court on February 25, 2013.  See Doc. No. 1.  As

17   pled, it appears that six of the eleven breaches (from February 22, 2009, backward) are beyond the

18   4-year limitations period, and thus time-barred.

19        M&R argues in opposition that the discovery rule may apply, especially if the transactions

20   were consignments, because it would be unknown when the kiwis were actually sold by Trinity.

21   However, these arguments are contrary to the allegations in the FAC.  The second cause of action

22   is based on a direct sale contract with definite due dates for payment.  See FAC ¶¶ 32-41.  To now

23   contend that payment was due only upon the actual sale of the kiwis is contrary to the FAC's

24   allegations, and thus is improper.  See Pickern, 457 F.3d at 968-69; Hurlbert, 439 F.3d at 1297;

25   Coleman, 232 F.3d 1271, 1292-93; American Title, 861 F.2d at 226.  Also, when payment was not

26   received on the specified dates, it would have been known and entirely evident to M&R that a

27   breach had occurred.  It is unknown how the discovery rule could apply when definite payment

28   due dates are alleged.

25

1      **3.**     <u>Third Cause of Action – California Commercial Code § 2703 - Price of Goods</u>

2      M&R's third cause of action is brought under California Commercial Code § 2703(e).

3  California Commercial Code § 2703(e) reads in part:  "Where the buyer wrongfully rejects or

4  revokes acceptance of goods or fails to make a payment due on or before delivery or repudiates

5  with respect to a part or the whole, then with respect to any goods directly affected . . . the

6  aggrieved seller may: . . . (e) Recover damages for nonacceptance (Section 2708) or in a proper

7  case the price (Section 2709)."   However, like the second cause of action, this claim is based on

8  allegations that the provision of kiwis by M&R to Trinity were direct sales to Trinity.  In other

9  words, this claim is based on a direct sale contract, not a consignment contract.  For the same

10  reasons discussed under the second cause of action regarding the consequences of the FAC's

11  allegations, summary judgment in favor of Trinity on this cause of action is appropriate.

12      **4.**     <u>Fourth & Fifth Causes of Action – Common Counts</u>

13      Under California law, "common counts" are general pleadings that seek to recover money

14  owed without necessarily specifying the nature of the claim.  <u>See</u> <u>Title Ins. Co. v. State Bd. of</u>

15  <u>Equalization</u>, 4 Cal.4th 715, 731 (1992); <u>Interstate Grp. Adm'rs v. Cravens</u>, 174 Cal.App.3d 700,

16  706 & n.2 (1985).  "A common count is proper whenever the plaintiff claims a sum of money due,

17  either as an indebtedness in a sum certain, or for the reasonable value of services, goods, etc.,

18  furnished."  <u>Kawasho Int'l, U.S.A. v. Lakewood Pipe Serv.</u>, 152 Cal.App.3d 785, 793 (1983).  A

19  "book account" and an "account stated" are both "common counts."  <u>See</u> <u>Fagelbaum & Heller</u>

20  <u>LLP</u>, 174 Cal.App.4th 1351, 1355 (2009).

21      A "book account" is defined by statute as:

22        a detailed statement which constitutes the principal record of one or more
          transactions between a debtor and a creditor arising out of a contract or some
23        fiduciary relation, and shows the debits and credits in connection therewith, and
          against whom and in favor of whom entries are made, is entered in the regular
24        course of business as conducted by such creditor or fiduciary, and is kept in a
          reasonably permanent form and manner and is (1) in a bound book, or (2) on a
25        sheet or sheets fastened in a book or to backing but detachable therefrom, or (3) on
          a card or cards of a permanent character, or is kept in any other reasonably
26        permanent form and manner.

27  Cal. Code Civ. Pro. § 337a.  "A book account is created by the agreement or conduct of the parties

28  in a commercial transaction."  <u>H. Russell Taylor's Fire Prevention Service, Inc. v. Coca Cola</u>

1   Bottling Corp., 99 Cal.App.3d 711, 728 (1979); see also Maggio, Inc. v. Neal, 196 Cal.App.3d

2   745, 752 (1987).  Importantly, "moneys due under an express contract cannot be recovered in an

3   action on an 'open book account' in the absence of a contrary agreement between the parties."

4   H&C Global Supplies Sa De Cv v. Pandol Aosscs. Marketing, Inc., 2013 U.S. Dist. LEXIS

5   159185, *6-*7 (E.D. Cal. Nov. 6, 2013); Dreyer's Grand Ice Cream, Inc. v. Ice Cream Distributors

6   of Evansville, LLC, 2010 U.S. Dist. LEXIS 47738, *11 n.5 (N.D. Cal. May 14, 2010); Armstrong

7   Petroleum Corp. v. Tri-Valley Oil & Gas Co., 116 Cal.App.4th 1375, 1396 n.9 (2004).  "An

8   express contract is one the terms of which are stated in words, but such a contract need not be in

9   writing."  Treadwell v. Nickel, 194 Cal. 243, 261 (1924); see also Johnny A. Ribeiro v. Larocca,

10  2009 Cal.App. Unpub. 4460, *19-*20 (June 5, 2009) (noting that an oral contract is an express

11  contract).[10]  "Parties to a written or oral contract may . . .  provide that monies due under such

12  contract be the subject of an account between them."  H. Russell Taylor, 99 Cal.App.3d at 728; see

13  also Windecker, Inc. v. Menefee, 2011 Cal.App. Unpub. LEXIS 9656, *11 (Dec. 19, 2011).

14  "[C]ourts require that the parties expressly intend to be bound because accruing debts under an

15  express contract are not normally considered the subject of an open book account."  In re Roberts

16  Farms, Inc., 980 F.2d 1248, 1252 n.3 (9th Cir. 1992).  The "mere incidental keeping of accounts

17  does not alone create a book account."  Maggio, 196 Cal.App.3d at 752; H. Russell Taylor, 99

18  Cal.App.3d at 728.

19        An "account stated" is "an agreement, based on prior transactions between the parties, that

20  all items of the account are true and that the balance struck is due and owing from one party to the

21  other."  S.O.S., Inc. v. Payday, Inc., 886 F.2d 1081, 1091 (9th Cir. 1989); Trafton v. Youngblood,

22  69 Cal.2d 17, 25 (1968).  The elements of an account stated are: "(1) previous transactions

23  between the parties establishing the relationship of debtor and creditor; (2) an agreement between

24  the parties, express or implied, on the amount due from the debtor to the creditor; (3) a promise by

25  the debtor, express or implied, to pay the amount due."  Zinn v. Fred R. Bright Co., 271

26  Cal.App.2d 597, 600 (1969); see also Maggio, 196 Cal.App.3d at 752-53.  Both parties must

27

28  [10] Despite state rules, the Court may consider unpublished state cases as persuasive authority.  See Employers Ins. of Wausau v. Granite State Ins. Co., 330 F.3d 1214, 1220 n.8 (9th Cir. 2003); Altman v. HO Sports, 821 F.Supp.2d 1178, 1189 n.4 (E.D. Cal. 2011).

1   assent to the new amount owed in order to create an account stated.  See Hansen v. Fresno Jersey

2   Farm Dairy Co., 220 Cal. 402, 408 (1934); Maggio, 196 Cal.App.3d at 752.  The agreement

3   necessary to establish an account stated need not be express and may be implied from the

4   circumstances.  See Hansen, 220 Cal. at 408; Maggio, 196 Cal.App.3d at 753.  If a statement is

5   rendered to the debtor, and the debtor does not reply in a reasonable time, the law implies an

6   agreement that the account is correct.  Maggio, 196 Cal.App.3d at 753; Zinn, 271 Cal.App.2d at

7   600; see also Davis v. Cox & Summa Corp., 751 F.2d 1507, 1515 (9th Cir. 1985); Hansen, 220

8   Cal. at 408.  However, "where liability had been long and persistently denied, the failure of a

9   person to object to the correctness of a statement of account sent to him does not imply a promise

10  to pay or convert the transaction into an account stated."  Cowell v. Snyder, 171 Cal. 291, 295

11  (1915).  "An account stated constitutes a new contract which supersedes and extinguishes the

12  original obligation."  Zinn, 271 Cal.App.2d at 600; see Jones v. Wilson, 10 Cal.2d 493, 498

13  (1938).  Thus, an "action upon an account stated is not upon the original dealings and transactions

14  of the parties," rather it is "upon the new contract by and under which the parties have adjusted

15  their differences and reached an agreement."  Gardner v. Watson, 170 Cal. 570, 574 (1915); see

16  S.O.S., 886 F.2d at 1091; Gleason v. Klamer, 103 Cal.App.3d 782, 786-87 (1980).  As a result of

17  the nature of an "account stated," "a debt which is predicated upon the breach of the terms of an

18  express contract cannot be the basis of an account stated."  Moore v. Bartholomae Corp., 69

19  Cal.App.2d 474, 477 (1945) (citing Rio Linda Poultry Farms v. Fredericksen, 121 Cal.App. 433,

20  435 (1932)); see also Jones, 10 Cal.2d at 498; Kent H. Landsberg Co. v. Freeman, 2013 Cal.App.

21  Unpub. LEXIS 3757, *13-*14 (May 28, 2013); Brown, White, & Newhouse, LLP v. Wykidal,

22  2012 Cal.App. Unpub. LEXIS 4912, * 27 n.7 (June 29, 2012).

23          Here, the Court is not satisfied that the parties have adequately brought M&R's common

24  counts into issue through the pending summary judgment motions.  The common counts were first

25  raised as part of M&R's reply brief.  Considering that M&R did not move for summary judgment

26  on the common counts, nor did Trinity make any arguments regarding the common counts in its

27  opposition and counter-motion, it is unclear why M&R mentioned the common counts in its reply

28  at all.  Based on the arguments made by the parties prior to M&R's reply brief, the common count

claims would have remained in this case.  If the parties wished the Court to consider the common

counts as part of the summary judgment proceedings, then arguments and evidence regarding

those claims should have been expressly included in either M&R's initial memorandum or

Trinity's opposition/counter-motion.

Considering the arguments that have been made in M&R's reply and Trinity's sur-reply,

the Court cannot grant summary judgment.  Trinity is correct that common counts cannot be used

to recover for breach of an express contract or to avoid a time barred breach of contract claim.  See

Armstrong Petroleum, 116 Cal.App.4th at 1396 n.9; Moore, 69 Cal.App.2d at 477.  However, the

evidence as presented does not establish that M&R is attempting to do this.

With respect to the account stated claim, there is a March 30, 2009, e-mail from Raden to

Trinity that purports to re-cap a meeting between the parties.  See M&R Ex. 20.  Included in this

e-mail is a statement of debt allegedly owed, and the statement appears to take into account

various deductions, including repackaging expenses.  See M&R Ex. 20.  No response to this e-

mail has been provided.  Given the state of the briefing, the March 30, 2009, e-mail suggests an

agreement separate from the consignment agreement might exist, and this separate agreement

might constitute an account stated.[11]  Cf. Gardner, 170 Cal. at 574.

As to the claim for a book account, a key issue is whether the parties agreed to create a

book account.  As part of an oral or written contract, parties can agree to maintain a book account.

H. Russell Taylor, 99 Cal.App.3d at 728.  Thus, as part of the parties' consignment agreement,

they could have agreed to maintain a book account and a cause of action on the book account

could be pursued.  See Warda v. Schmidt, 146 Cal.App.2d 234, 237 (1956).  However, there is no

evidence one way or the other on this particular issue.  What the Court can say is that simply

because there was an express agreement between the parties regarding kiwis does not mean that no

book account claim can be pursued.[12]  See H. Russell Taylor, 99 Cal.App.3d at 728.

---

[11] The Court is not holding that the e-mail is per se sufficient to create a genuine dispute.  Rather, the Court is holding that given the absence of other evidence and arguments by parties, there appears to be at least a colorable argument to be made.  Additional evidence and argument on the issue may later show that there is no viable account stated claim.

[12] Again, the Court is not holding that the evidence presented is per se sufficient to create a genuine dispute.  The Court is holding that the evidence and arguments presented do not establish that M&R cannot maintain a viable claim for a book account.

1    Given the state of the evidence and the briefing, summary judgment on the common counts

2    will be denied.

3    However, this case is set for a bench trial to begin on November 18, 2014.  The pre-trial

4    conference is set for October 1, 2014.  In the wake of this order, the only claims that will be left

5    are M&R's two common counts.  If, after further review, one side believes that a second summary

6    judgment motion would likely resolve this case or beneficially limit the issues for trial, then that

7    side may file a request to file a second summary judgment motion.  See Hoffman v. Tonnemacher,

8    593 F.3d 908, 911 (9th Cir. 2008) (district courts have discretion to permit successive summary

9    judgment motions).  The request should briefly explain the basis for the belief that a second

10   summary judgment motion would be beneficial.  If the Court grants the request, the Court will set

11   a briefing schedule and possibly vacate either or both of the pre-trial conference date or trial date.

12   For purposes of trial or a second summary judgment motion, it is possible that documents

13   in the Italian language will be submitted.  If a party relies on a document or portion of a document

14   that is written in a language other than English, that party must ensure that some form of

15   translation into English is provided, that the translation is accurate, and that the translator was

16   qualified to make the translation.  Cf. Fed. R. Evid. 604; Lopez-Carrasquillo v. Rubianes, 230 F.3d

17   409, 413-14 (1st Cir. 2000); City of New York v. GeoData Plus, LLC, 537 F.Supp.2d 443, 448 n.9

18   (E.D. N.Y. 2007).

19       5.   Improperly Named Defendant

20   In his declaration, White states that Trinity is a separate entity from Trinity Fruit

21   Company.  See White Dec. ¶ 21.  From this, Trinity argues that it is an erroneously named or

22   improper defendant.  However, as M&R correctly points out, Trinity's name appears on what

23   purports to be M&R's various invoices and on USDA inspection reports.  E.g. Trinity Ex. A3 at

24   Bates Nos. MAR000021, MAR000030.  Also, Trinity's address and agent for service is identical

25   to that of Trinity Fruit Company.[13]  See Trinity Ex. A.  Most importantly, however, Alaniz's e-

26   mails related to the kiwi transactions with M&R are signed "Maria Alaniz" and the words "Trinity

27

28   _____

[13] The Court also notes that despite arguing that it is an improper defendant, Trinity has made substantive arguments against M&R's causes of action.

30

1  Fruit Sales" appear under her signature.  See M&R Ex. B Bates Nos. 000065, 000098, 000107.

2  Despite White's declaration, the Court cannot hold that Trinity is an improper defendant.

3  Summary judgment on this issue is improper.

4

5  <u>**CONCLUSION**</u>

6  With respect to the first cause of action, summary judgment in favor of Trinity will be

7  granted because the transactions at issue were consignments, and consignments are not covered by

8  the CISG.

9  With respect to the second cause of action, summary judgment in favor of Trinity will be

10  granted for two reasons.  First, the allegations in the FAC preclude M&R from pursuing a breach

11  of consignment agreement claim.  The FAC's allegations conclusively show that this cause of

12  action is for breach of a direct sale agreement, and there is no mention of consignments.  Second,

13  M&R has not established that the 4-year limitations period applies to this cause of action.  There is

14  no dispute that M&R was aware of the breaches in 2009, and that this case was filed in 2013.

15  Since the 4-year limitations period does not apply, the 2-year period does, and filling a complaint

16  in 2013 is too late.  Alternatively, even if the 4-year period applied, six of the express breaches

17  identified in the FAC are on their face time-barred.[14]

18  With respect to the third cause of action, for the same reasons discussed under the second

19  cause of action regarding the FAC's allegations, summary judgment in favor of Trinity is granted.

20  With respect to the fourth and fifth common count causes of action, the parties did not

21  adequately raise those claims for purposes of summary judgment.  The evidence and arguments

22  presented do not conclusively establish or defeat causes of action for a book account or an account

23  stated.  Therefore, summary judgment on these claims will be denied.  However, the parties may

24  file a request to file second summary judgment motion regarding the common counts.

25  Finally, with respect to the claim that Trinity is an improper defendant, Trinity has not

26  adequately established this defense.  Summary judgment on this issue is denied.

27
_____

28  [14] Given the Court's resolution of the first two causes of action, it is unnecessary to address Trinity's PACA arguments.  However, the Court notes that it has been held that PACA does not usurp common law actions.  <u>See</u> <u>Fischer v. Machado</u>, 50 Cal.App.4th 1069, 1074 (1996).  31

1

**ORDER**

2

Accordingly, IT IS HEREBY ORDERED that:

3   1.      Plaintiff's motion for summary judgment is DENIED;

4   2.      Defendant's motion for summary judgment as to the first, second, and third causes of

5           action is GRANTED;

6   3.      Defendant's motion for summary judgment is otherwise DENIED; and

7   4.      As discussed above, within ten (10) days of service of this order, either party may file a

8           request to file a second summary judgment motion regarding Plaintiff's fourth and fifth

9           causes of action.

10

IT IS SO ORDERED.

11

12   Dated:   July 2, 2014                      _____

                                               SENIOR  DISTRICT  JUDGE

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28