UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **MARTINI E RICCI IAMINO S.P.A. – CONSORTILE SOCIETA AGRICOLA,** an Italian Company,<br><br>Plaintiff<br><br>v.<br><br>**TRINITY FRUIT SALES COMPANY, INC.,** a California Corporation, and DOES 1-20,<br><br>Defendant | CASE NO. 1:13-CV-276 AWI SAB<br><br>**ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**<br><br>(Doc. Nos. 35) |

This case stems from the provision of kiwi fruit from Plaintiff Martini E Ricci Iamino S.P.A. ("M&R") to Trinity Fruit Sales Company, Inc. ("Trinity"). The active complaint is the First Amended Complaint ("FAC"). This Court previously granted summary judgment in favor of Trinity on three of the FAC's five causes of action, and then gave Trinity permission to file a second motion for summary judgment on the two remaining causes of action. See Doc. Nos. 32, 34. Trinity now moves for summary judgment on the account stated and book account causes of action. For the reasons that follow, the Court will grant the motion and close this case.

**FACTUAL BACKGROUND**[1]

M&R is an Italian company that grows kiwi fruit on its property in Italy. See PUMF 1.

---

[1] "PUMF" refers to Plaintiff's Undisputed Material Fact submitted on March 10, 2014 as part of its motion for summary judgment. See Doc. No. 21-2. "DUMF" refers to Defendant's Undisputed Material Fact submitted on July 25, 2014 as part of its second motion for summary judgment.

1  Andrea Martini ("Martini") is the Vice President of M&R.  PUMF 2.  Gary Raden ("Raden") and
2  Stefano De Nadai ("De Nadai") worked together and were something between an agent and broker
3  for M&R.  See Raden Depo. 8:15-10:10, 66:11-66:18.  Raden explained that they solicit the
4  product from producers/suppliers and negotiate the sales with the receivers.  See id. at 8:15-20,
5  9:21-10:10.  Raden is located in the United States, and De Nadai is located in Italy.  See id. at 7:8-
6  8:2, 9:21-10:4.  Raden and De Nadai were involved in the solicitation of fruit from M&R for the
7  transaction with Trinity.  See id. at 10:2-10:19.  Martini worked with De Nadai on a regular basis,
8  and De Nadai was aware of the general terms under which M&R sold kiwis, including the prices
9  M&R expected for various sizes and quantities.  PUMF 4.  Martini has characterized Raden and
10 De Nadai as independent sales people who are not employees of M&R.  See Martini Dec. ¶ 3.
11 M&R paid Raden and De Nadai fees of 3% for their services, but Trinity paid Raden and De
12 Nadai nothing.  See Raden Depo. 66:20-67:1.  Raden would typically negotiate with Trinity, pass
13 the order information on to De Nadai, and De Nadai would transmit the order to M&R by e-mail.
14 PUMF 7.  De Nadai's e-mail orders were copied to Raden, who would confirm that the e-mail
15 reflected the agreement struck with Trinity.  See PUMF 8.

16     Trinity agreed to market and sell M&R's 2008-2009 kiwi crop on a consignment basis.
17 See Martin E Ricci Iamino S.P.A – Consortile Sociate Agricola v. Trinity Fruit Sales, 2014 U.S.
18 Dist. LEXIS 90604, *30 (E.D. Cal. July 2, 2014); DUMF 2.  Generally, there were two types of
19 kiwi shipments involved between M&R and Trinity regarding M&R's 2008-2009 kiwi crop.  See
20 Martini Dec. ¶ 4; Initial White Dec. ¶ 9.  The first type involved 14 kg. boxes that were to be sold
21 to Trinity's customers Costco and Sam's Club at fixed prices.  See id.; PUMF 11.  M&R provided
22 4 loads of the 14 kg. boxes.  See White Dec. ¶ 4.  The second type involved consignments of 9 kg.
23 boxes of kiwis to be sold on the general market.  See Martini Dec. ¶ 4; White Dec. ¶ 9.  Martini
24 declares that there was a minimum price expectation for the 9 kg. boxes.  See Martini Dec. ¶ 4.
25 Martini declares that the minimum agreed price was memorialized in e-mails between De Nadai
26 and M&R.  See id.  White declares, however, that there were no fixed or minimum prices for the 9
27 kg. boxes.  See White Dec. ¶ 9; Supp. White Dec. ¶ 8.  Raden testified that he did not recall
28 whether any minimum price was established for the 9 kg. consignment loads, but that a seller in

Trinity's position has an obligation to achieve the best possible market price. PUMF 14. However, Raden also testified that the price per box which appears on the 9 kg. box consignment orders was a "theoretical price." PUMF 13. Similarly, after acknowledging that the 9 kg. boxes were on consignment, Raden testified that the term "consignment" meant to him that the receiver sells the product at the best price it can get, deducts its costs, and returns the net amount that is left after deductions to the shipper. See Raden Depo. 76:7-25. Raden testified that M&R's invoice amounts (found in the third column of the invoices) were of "no moment" because Trinity did not agree to buy the fruit at an agreed price. See id. at 77:7-78:11.

Of the shipments of M&R kiwis that were inspected by the USDA, all but one received a grade of Number 1. See PUF 32.[2] Only one container (Order No. 12) failed USDA inspection, which had average defects of 9%. See PUF 34. However, each of the USDA reports did indicate some degree of decay. See Trinity Ex. B at Bates Nos. 000073-000080. Additionally, on February 16, 2009, and February 20, 2009, Trinity sent e-mails to Raden and De Nadai regarding severe damage to Order No. 30. See Trinity Ex. B at Bates Nos. 000106-000114. On February 20, 2009, Trinity sent another e-mail to Raden and De Nadai that M&R's kiwis were not holding up well in storage, and that Trinity had been telling De Nadai and Raden this "from the beginning." See id. at Bates No. 000116. White has declared that there were "numerous condition and quality issues" with M&R's kiwis. See Supp. White Dec. ¶ 7.

Trinity marketed and sold the kiwis, accounted to M&R for its handling of all loads, and submitted the net returns to M&R, which were accepted by M&R. See DUMF 4. The price obtained by Trinity was below the minimum price that M&R was anticipating. See Martini Dec. ¶ 4. Martini reviewed liquidation reports, but did not believe that the liquidation reports explained what he believed to be the low returns. See Martini Dec. ¶ 41. In some instances, there were up to 3 liquidation reports, and sometimes the reports were unclear and appeared to be inconsistent with each other. See PUF 18. In Raden's words, "in some instances, there were one, two, and three liquidation reports before we got the accurate thing, and in some cases we never did." PUMF 19. M&R never received a satisfactory explanation as to why the returns were so low. PUF 20.

---

[2] No USDA inspection report is available for Order No. 46. See PUF 33.

In March 2009, Trinity's president David White ("White") met with Raden at Trinity's offices in California. DUMF 5. Raden was unhappy with the sales returns for M&R's kiwis, as well as repackaging charges by Trinity that were incurred to address the numerous condition and quality issues with M&R's kiwis. See id. During the meeting, White verbally informed Raden that Trinity disputed any amounts owing to M&R in connection with the sales of M&R's kiwis. See DUMF 7. Additionally, White declares that, while he cannot attest to what M&R may have done, he can "say with certainty that Trinity never agreed to keep a 'book account' in connection with the handling of [M&R]'s kiwi, nor did [Trinity] keep a book account together with [M&R] or separately." Supp. White Dec. ¶ 16.

Following the meeting, Raden sent an e-mail on March 31, 2009, to White and two Trinity employees. DUMF 6. Raden's e-mail outlined his thoughts about additional amounts that could have been returned to M&R in connection with the kiwi sales. See id. The e-mail had two pages of a spreadsheet-like-chart. See M&R Ex. 20. The spreadsheet described five "Groups" of kiwi loads, and four of the five groups have a column for an "amount due." See id. In pertinent part, Raden's e-mail reads:

> [P]lease find attached a chart re-capping our meeting in California. The issues discussed have been broken into Five Categories.
>
> Group One – Costco and Sam Fixed price 5% commission. On the highlighted loads we would ask to see the usda/Deco and repacking slips to verify the repacking of these loads.
>
> Group Two – 9kg vf loads arrived on the East Coast and transferred to the west coast.
>
> Group Three – 9kg vf loads arrived on the West Coast. On the highlighted loads we would ask to verify the sell prices of the liquidation as they are not consistent with the published data for sell prices during the arrival times of the loads. The prices presented are considerably lower than published data.
>
> Group Four – Insurance Claim. . . . we are hoping that this load was submitted for an insurance claim as the demurrage charges are excessive. If it has not, please have Barthco submit an explanation of the demurrage charges and we will claim against the steamship company.
>
> Group Five – Invoices Due. [A certain invoice] is due now and no deductions for product loss or repacking will be agreed to as this is a 9kg east coast arrival transferred to the west coast.
>
> The last three of the loads invoices are due in May. If there are any deductions for

4

> product quality at the time of payment, we would need to see the usda and repacking slips.
>
> The growers are still considering the returns on several other invoices, which I would hope to have back to you later today, Group Six.
>
> Please let us know by the end of the week if the information provided is in accordance with our conversation and acceptable in principle. As many of these invoices are quite old in terms of an acceptable due date, several of the suppliers need this confirmation by the end of the week or they will proceed with claims the first of next week.
>
> We appreciate the help and patience of all parties and hope that we can quickly bring all issues to a conclusion.

Id.

Raden testified at his deposition that he could not recall the March 2009 meeting that he referenced in the March 31 e-mail, nor could Raden recall preparing the March 31 e-mail. DUMF 8. Consequently, Raden could not testify that the e-mail summarized an actual agreement between the parties. See id.

On the other hand, White declares that there was never any agreement between Trinity and M&R that additional amounts were due and owing to M&R, nor did Trinity expressly or impliedly agree to pay any additional sums in connection with the sales of M&R's kiwis. See Supp. White Dec. ¶ 14. In particular, White declares:

> At no time during the March 2009 meeting did I or anyone else at Trinity reach any agreement with Mr. Raden suggesting that additional amounts were owed by Trinity. In fact, I verbally informed Mr. Raden that Trinity disputed owing any additional amounts to [M&R] in connection with its handling of the kiwi.
>
> Following the meeting, Mr. Raden sent an e-mail to me and Trinity employees Brian Hiett and Maria Alaniz on March 31, 2009, reiterating his dissatisfaction about the returns Trinity obtained for [M&R]'s kiwi and outlining *his* thoughts about additional amounts that could have been returned to [M&R].
>
> I did not agree with Mr. Raden's thoughts or his calculations during our face to face meeting, which I told Mr. Raden, nor did I agree with them when I received his e-mail.
>
> I took his e-mail for what it was: his opinion of what the returns should have been. I did not view his e-mail as any sort of confirmation of reaching an agreement during the March 2009 meeting, since there wasn't any, nor did I think that it was meant to be a proposal to Trinity to resolve the dispute with [M&R]."

Supp. White Dec. ¶¶ 10-13 (emphasis in original).

Between March 31, 2009 and April 11, 2009, Trinity made additional payments to M&R.

5

See M&R Ex. A1. After March 31, 2009, Trinity paid: (1) $3,398.40 on order No. 13; (2) $2,518.04 on order No. 27; (3) $4,664.40 on order No. 28; (4) $1,092.69 on order No. 30; and (4) $374.10 on order No. 33. See id. In total, $12,047.63 was paid to M&R by Trinity after March 31, 2009. See id. Also, multiple payments had been made on order Nos. 13, 16, 27, 28, and 33 prior to March 31, 2009.

On April 11, 2009, M&R sent Trinity a letter that reads in pertinent part:

> Thank you for the additional payment and revised liquidations [sic] information.
>
> We will apply the additional funds as additional partial liquidations. But, please note, we are confused by the presentation of some of the revised information. There are instances where liquidation prices, product loss and repacking expenses have been changed from the original liquidation we received at time of first payments!! How is it possible that all of this information could change when we were originally asked trough [sic] Stefano and Gary, to accept the first liquidation information as accurately presented and authenticated by Trinity??
>
> On certain loads, we already received even 3 different versions: - preliminary report, - liquidation 1st version, - liquidation 2nd version, and they are all quite different from each other!!!
>
> We believe that the revised information and circumstances presented by Mr. Raden and De Nadai more properly represent the circumstances of the arrival and handling of the [M&R] loads than either first or second version of your liquidations. So we will apply the additional payments to the loads identified and where the returns reasonably approximate the revised information presented to Trinity, we will close the files. Where there remains a difference in valuations we will eventually proceed as indicated in our previous correspondence, assuming Trinity will remain in its own position.
>
> We will provide an up date of those invoices where the files can be closed and those that remain open.
>
> Please note, that with the filing of any insurance claim, the full value of the proforma/definitive invoice has to be claimed, even though this amount has been mitigated in the presentation of values [sic] for and [sic] amicable resolution.

M&R Ex. B1.

White declares that "there are no additional amounts due and owing from Trinity in connection with its handling of [M&R]'s 2008-2009 kiwi crop." Supp. White Dec. ¶ 17.

## SUMMARY JUDGMENT FRAMEWORK

Cross motions for summary judgment are evaluated separately under the same standards that apply to single summary judgment motions. See Pintos v. Pacific Creditors Ass'n, 565 1106,

1111 (9th Cir. 2009); ACLU v. City of Las Vegas, 466 F.3d 784, 790 (9th Cir. 2006). Summary judgment is appropriate when it is demonstrated that there exists no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970); Fortyune v. American Multi-Cinema, Inc., 364 F.3d 1075, 1080 (9th Cir. 2004). The party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and of identifying the portions of the declarations (if any), pleadings, and discovery that demonstrate an absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Soremekun v. Thrifty Payless, Inc., 509 F.3d 978, 984 (9th Cir. 2007). A fact is "material" if it might affect the outcome of the suit under the governing law. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986); United States v. Kapp, 564 F.3d 1103, 1114 (9th Cir. 2009). A dispute is "genuine" as to a material fact if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party. Anderson, 477 U.S. at 248; Freecycle Sunnyvale v. Freecycle Network, 626 F.3d 509, 514 (9th Cir. 2010).

Where the moving party will have the burden of proof on an issue at trial, the movant must affirmatively demonstrate that no reasonable trier of fact could find other than for the movant. Soremekun, 509 F.3d at 984. Where the non-moving party will have the burden of proof on an issue at trial, the movant may prevail by presenting evidence that negates an essential element of the non-moving party's claim or by merely pointing out that there is an absence of evidence to support an essential element of the non-moving party's claim. See James River Ins. Co. v. Herbert Schenk, P.C., 523 F.3d 915, 923 (9th Cir. 2008); Soremekun, 509 F.3d at 984. If a moving party fails to carry its burden of production, then "the non-moving party has no obligation to produce anything, even if the non-moving party would have the ultimate burden of persuasion." Nissan Fire & Marine Ins. Co. v. Fritz Cos., 210 F.3d 1099, 1105-06 (9th Cir. 2000). If the moving party meets its initial burden, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually exists. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986); Nissan Fire, 210 F.3d at 1103. The opposing party cannot "'rest upon the mere allegations or denials of [its] pleading' but must instead produce evidence that 'sets

forth specific facts showing that there is a genuine issue for trial.'" Estate of Tucker v. Interscope Records, 515 F.3d 1019, 1030 (9th Cir. 2008).

The opposing party's evidence is to be believed, and all justifiable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party. See Anderson, 477 U.S. at 255; Matsushita, 475 U.S. at 587; Narayan v. EGL, Inc., 616 F.3d 895, 899 (9th Cir. 2010). While a "justifiable inference" need not be the most likely or the most persuasive inference, a "justifiable inference" must be rational or reasonable. See Narayan, 616 F.3d at 899. "If conflicting inferences may be drawn from the facts, the case must go to the jury." Holly D. v. Cal. Inst. of Tech., 339 F.3d 1158, 1175 (9th Cir. 2003). Inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. See Sanders v. City of Fresno, 551 F.Supp.2d 1149, 1163 (E.D. Cal. 2008); UMG Recordings, Inc. v. Sinnott, 300 F.Supp.2d 993, 997 (E.D. Cal. 2004). "A genuine issue of material fact does not spring into being simply because a litigant claims that one exists or promises to produce admissible evidence at trial." Del Carmen Guadalupe v. Agosto, 299 F.3d 15, 23 (1st Cir. 2002); see Bryant v. Adventist Health System/West, 289 F.3d 1162, 1167 (9th Cir. 2002). Further, a "motion for summary judgment may not be defeated . . . by evidence that is 'merely colorable' or 'is not significantly probative.'" Anderson, 477 U.S. at 249-50; Hardage v. CBS Broad. Inc., 427 F.3d 1177, 1183 (9th Cir. 2006). If the nonmoving party fails to produce evidence sufficient to create a genuine issue of material fact, the moving party is entitled to summary judgment. Nissan Fire, 210 F.3d at 1103.

**DEFENDANT'S MOTION**

*Defendant's Arguments*

Trinity argues that there is no evidence of an agreement between the parties to create an account stated. Raden testified that he has no recollection of the March 2009 meeting or the resulting e-mail. Raden could not testify that the e-mail was a confirmation of an agreement reached between the parties during the meeting or at any time. Raden's e-mail at the end requested that Trinity let Raden know if the information provided was in accordance with the

meeting and acceptable in principle. This section shows that Trinity was being subject to an "either or" scenario. Either Trinity agree to the information in the e-mail, or several suppliers would file claims against Trinity. Had an agreement actually been reached at the March 2009 meeting, there would be no need for Raden to include the "either or" scenario in the e-mail. White has declared that there was no agreement reached and that he believed Raden's e-mail simply represented Raden's own opinions. At best, M&R's cause of action is based on nothing more than a demand to pay a disputed debt, which is not an account stated.

Trinity also argues that M&R has submitted no accounting or system of bookkeeping in support of this claim. Moreover, there are neither allegations nor evidence that shows an agreement by the parties to create a book account. No conduct has been identified that is consistent with the parties agreeing to create a book account. In fact, White has declared that there was no agreement to create a book account between Trinity and M&R, and denies that any additional sums are owed by Trinity to M&R.

*Plaintiff's Opposition*

M&R argues that the facts as represented by Trinity show two distinct stages to the kiwi transaction. Because it has been argued by Trinity and held by the Court that the kiwis were sold as consignments, the amount owed by Trinity to M&R would necessarily be determined after Trinity sold the kiwis. Further negotiation between Trinity and M&R occurred after Trinity sold the kiwis. These negotiations occurred because Trinity never adequately accounted for its handling and sale of the kiwis, but instead provided numerous and inconsistent "lot summaries"/liquidation reports. Raden met with Trinity employees about the amounts M&R averred were still owed by Trinity. Although White declares that Trinity did not agree to make further payments, Trinity made several payments for various shipments both before and after the March 2009 meeting and before and after M&R issued its last invoice on March 31, 2009. Trinity's conduct is inconsistent with the notion that a complete agreement for the sale of kiwis was in place. An account stated may be implied by the circumstances and by a failure to object to an account when the account has been sent to the debtor. Trinity's conduct shows that the parties established subsequent agreements about the amounts owed by Trinity. Again, Trinity made

additional payments, which are an acknowledgment of the "account" and that money was owed. Each payment made by Trinity was an implied acknowledgment that Trinity had not satisfied the account.

*Legal Standards*

An "account stated" is "an agreement, based on prior transactions between the parties, that all items of the account are true and that the balance struck is due and owing from one party to the other." S.O.S., Inc. v. Payday, Inc., 886 F.2d 1081, 1091 (9th Cir. 1989); Trafton v. Youngblood, 69 Cal.2d 17, 25 (1968). The elements of an account stated are: "(1) previous transactions between the parties establishing the relationship of debtor and creditor; (2) an agreement between the parties, express or implied, on the amount due from the debtor to the creditor; (3) a promise by the debtor, express or implied, to pay the amount due." Zinn v. Fred R. Bright Co., 271 Cal.App.2d 597, 600 (1969); see also Maggio, 196 Cal.App.3d at 752-53. Both parties must assent to the new amount owed in order to create an account stated. See Hansen v. Fresno Jersey Farm Dairy Co., 220 Cal. 402, 408 (1934); Maggio, 196 Cal.App.3d at 752. The agreement necessary to establish an account stated need not be express and may be implied from the circumstances. See Hansen, 220 Cal. at 408; Maggio, 196 Cal.App.3d at 753. If a statement is rendered to the debtor, and the debtor does not reply in a reasonable time, the law implies an agreement that the account is correct. Maggio, 196 Cal.App.3d at 753; Zinn, 271 Cal.App.2d at 600; see also Davis v. Cox & Summa Corp., 751 F.2d 1507, 1515 (9th Cir. 1985); Hansen, 220 Cal. at 408. However, "where liability had been long and persistently denied, the failure of a person to object to the correctness of a statement of account sent to him does not imply a promise to pay or convert the transaction into an account stated." Cowell v. Snyder, 171 Cal. 291, 295 (1915). "An account stated constitutes a new contract which supersedes and extinguishes the original obligation." Zinn, 271 Cal.App.2d at 600; see Jones v. Wilson, 10 Cal.2d 493, 498 (1938). Thus, an "action upon an account stated is not upon the original dealings and transactions of the parties," rather it is "upon the new contract by and under which the parties have adjusted their differences and reached an agreement." Gardner v. Watson, 170 Cal. 570, 574 (1915); see S.O.S., 886 F.2d at 1091; Gleason v. Klamer, 103 Cal.App.3d 782, 786-87 (1980).

A "book account" is defined by statute as:

> a detailed statement which constitutes the principal record of one or more transactions between a debtor and a creditor arising out of a contract or some fiduciary relation, and shows the debits and credits in connection therewith, and against whom and in favor of whom entries are made, is entered in the regular course of business as conducted by such creditor or fiduciary, and is kept in a reasonably permanent form and manner and is (1) in a bound book, or (2) on a sheet or sheets fastened in a book or to backing but detachable therefrom, or (3) on a card or cards of a permanent character, or is kept in any other reasonably permanent form and manner.

Cal. Code Civ. Pro. § 337a. "A book account is created by the agreement or conduct of the parties in a commercial transaction." H. Russell Taylor's Fire Prevention Service, Inc. v. Coca Cola Bottling Corp., 99 Cal.App.3d 711, 728 (1979); see also Maggio, Inc. v. Neal, 196 Cal.App.3d 745, 752 (1987). Importantly, "moneys due under an express contract cannot be recovered in an action on an 'open book account' in the absence of a contrary agreement between the parties." H&C Global Supplies Sa De Cv v. Pandol Aosscs. Marketing, Inc., 2013 U.S. Dist. LEXIS 159185, *6-*7 (E.D. Cal. Nov. 6, 2013); Dreyer's Grand Ice Cream, Inc. v. Ice Cream Distributors of Evansville, LLC, 2010 U.S. Dist. LEXIS 47738, *11 n.5 (N.D. Cal. May 14, 2010); Armstrong Petroleum Corp. v. Tri-Valley Oil & Gas Co., 116 Cal.App.4th 1375, 1396 n.9 (2004). "An express contract is one the terms of which are stated in words, but such a contract need not be in writing." Treadwell v. Nickel, 194 Cal. 243, 261 (1924); see also Johnny A. Ribeiro v. Larocca, 2009 Cal.App. Unpub. 4460, *19-*20 (June 5, 2009) (noting that an oral contract is an express contract).[3] "Parties to a written or oral contract may . . . provide that monies due under such contract be the subject of an account between them." H. Russell Taylor, 99 Cal.App.3d at 728; see also Windecker, Inc. v. Menefee, 2011 Cal.App. Unpub. LEXIS 9656, *11 (Dec. 19, 2011). "[C]ourts require that the parties expressly intend to be bound because accruing debts under an express contract are not normally considered the subject of an open book account." In re Roberts Farms, Inc., 980 F.2d 1248, 1252 n.3 (9th Cir. 1992). The "mere incidental keeping of accounts does not alone create a book account." Maggio, 196 Cal.App.3d at 752; H. Russell Taylor, 99 Cal.App.3d at 728.

---

[3] Despite state rules, the Court may consider unpublished state cases as persuasive authority. See Employers Ins. of Wausau v. Granite State Ins. Co., 330 F.3d 1214, 1220 n.8 (9th Cir. 2003); Altman v. HO Sports, 821 F.Supp.2d 1178, 1189 n.4 (E.D. Cal. 2011).

11

*Discussion*

a. Account Stated

To recover on an account stated, M&R was required to submit evidence that shows M&R and Trinity assented or agreed to a final amount due, i.e. struck a balance due. See Hansen, 220 Cal. at 408; Maggio, 196 Cal.App.3d at 752; Zinn, 271 Cal.App.2d at 600.  M&R has not done so.

First, White's supplemental declaration reflects that Trinity, at the March 2009 meeting, disagreed with Raden's thoughts and calculations, disagreed that Trinity owed M&R any further payments, and reached no agreement with Raden/M&R over additional amounts owed.  See Supp. White Dec. ¶¶ 9-14.  White took Raden's e-mail as a recap of Raden's own thoughts and opinions, and not as reflecting any agreement to resolve the dispute.  See id. at ¶ 11.  White continues to dispute that any additional amounts are owed by Trinity to M&R.  See id. at ¶ 17.  White's declaration clearly negates the element of assent that is necessary for an account stated.  Raden has no recollection of the March 2009 meeting, and no evidence suggests that Raden would or could dispute White's assertions.  See DUMF 8.

Second, Raden's e-mail does not reflect that an agreement over additional amounts owed was reached.  Raden has no recollection of his March 31, 2009 e-mail, see id., and thus cannot add any further explanation or clarification beyond the express words of the e-mail.  The e-mail purports to be a recap of the March 2009 meeting, but it does not state that an agreement was reached, nor does it purport to present some type of accounting statement to Trinity.  See M&R Ex. 20.  The e-mail asks to see additional records and documentation, mentions the possibility of an insurance claim, notes that some of the invoices are not due until May, and that the growers are still considering several other invoices.  See id.  In other words, the e-mail reflects that there are significant "open items" between the parties.  Where there are contingencies as to the existence or amount of the debt, there can be no account stated.  See Truestone, Inc. v. Simi W. Indus. Park II, 163 Cal.App.3d 715, 726 (1984); Konda v. Lamkin, 19 Cal.App.2d 635, 639 (1937).  Moreover, the e-mail asks for Trinity to respond by the end of the week whether "the information provided is in accordance with our conversation *and acceptable in principle*." Id. (emphasis added).  If an agreement had been reached, there would have been no reason for Raden to ask Trinity to

1 affirmatively let Raden known whether the information was acceptable.  The fact that Raden made
2 such a request indicates that no agreement had been reached.

3      Third, it is not necessarily clear what precise amount is stated in the spreadsheet attached
4 to Raden's March 31 e-mail.  See M&R Ex. 20.  Groups 1 through 4 have a column for "amount
5 due," but only Group 1 has a column for "balance due."  See id.  Group 5 has no column for either
6 amount or balance due.  See id.  Adding the figures under the "amount due" columns yields a
7 figure in excess of $200,000.  See id.  Adding the figures under the "balance due" column yields a
8 figure of approximately $24,000.  See id.  However, in the FAC, M&R alleges that $139,187.88 is
9 due and owing under an account stated.  See FAC ¶ 50.  The $139,187.88 does not appear to be
10 fairly reflected in Raden's e-mail.  For there to be an account stated, "the amount due must be
11 specified or there must be a reference to something by which the amount due can be definitely and
12 certainly ascertained."  MacLaren v. Gilbert, 111 Cal.App. 198, 201 (1931).

13      Fourth, the April 11, 2009 letter from Martini expresses confusion over additional
14 documentation received from Trinity, and states that the additional amounts would be applied as
15 partial liquidations.  See M&R Ex. B1.  The letter states that M&R believes Raden's position
16 regarding arrival and handling of the kiwi loads is more accurate, and where "there remains a
17 difference in valuations we will eventually proceed as indicated in our previous correspondence,
18 assuming Trinity will remain in its own position."  Id.  Different valuations are inconsistent with
19 assenting to a particular amount due, as are threatening to proceed in a previously described
20 manner and holding separate "positions."  If an agreement had been reached between the parties
21 over the amount owed, then the letter would have referenced that agreed amount and would not
22 have referenced the differences in valuations, separate proceedings, and separate positions.

23      M&R relies on the fact that Trinity sent additional payments after March 31, 2009.
24 However, there is nothing to indicate that M&R and Trinity agreed that a particular sum was
25 owed.  M&R is claiming that Trinity owes it approximately $139,000.00.  See FAC ¶ 50.   Trinity
26 sent M&R approximately $12,000 after March 31, which is less than 10% of the claimed amount
27 owed.  Of the additional payments sent by Trinity, the Court cannot find that the individual
28 amounts correspond with any of the amounts identified in Raden's e-mail.  Cf. M&R Ex. 20 with

13

M&R Ex. A1.  If there had been assent to a particular amount, it seems more likely than not that the amounts paid would correspond to an amount requested.  At most, Trinity's additional payments were an acknowledgment that some money was owed to M&R, but it was not an acknowledgment that over $139,000 was owed.  "[I]f there is but an admission that something is due without specifying how much, there is no account stated . . . ."  American Mut. Liability Ins. Co. v. Chicago-Los Angeles Bldg. Corp., 88 Cal.App. 300, 301 (1928).  Without more, the fact that some small additional payments were made to M&R does not show agreement or assent by Trinity to owing over $139,000.

Because no evidence indicates the requisite assent for an account stated, summary judgment in favor of Trinity on this cause of action is appropriate.  See Hansen, 220 Cal. at 408; Maggio, 196 Cal.App.3d at 752; Zinn, 271 Cal.App.2d at 600.

  b. Fifth Cause of Action -- Book Account

Whether a book account exists is determined by examining the agreements and conduct of the parties in the context of their commercial dealings.  See Maggio, 196 Cal.App.3d at 752.  Here, there is no evidence that Trinity either requested or accepted bookkeeping from M&R on any debts.  The only direct evidence on the issue is White's supplemental declaration, and White declares that Trinity did not agree to keep a book account or be bound by a book account.  See White Dec. ¶ 16.  Neither Raden's testimony nor his March 2009 e-mail suggest that an agreement to create and/or be bound by a book account was made between M&R and Trinity.  It is true that M&R has submitted various invoices, but the "mere incidental keeping of accounts does not alone create a book account."  Maggio, 196 Cal.App.3d at 752; H. Russell Taylor, 99 Cal.App.3d at 728.  Additionally, it is apparent that there was an express agreement between the parties regarding the sale of kiwis.  There is no evidence that, as part of the express agreement for the consignment sale of kiwis, M&R and Trinity agreed to be subject to a book account.  See H&C Global, 2013 U.S. Dist. LEXIS 159185 at *6-*7; Armstrong Petroleum, 116 Cal.App.4th 1375, 1396 n.9; H. Russell Taylor, 99 Cal.App.3d at 728.  In sum, no agreement to be subject to a book account is apparent.

M&R appears to rely on the fact that additional payments were made by Trinity after March 31, 2009.  However, no evidence has been submitted as to why Trinity made those

14

additional payments. The additional payments were less than 10% of the amount claimed by M&R, and the payments were made after a meeting between M&R and Trinity regarding M&R's concerns over the prices obtained, repackaging expenses, and inconsistent "lot summaries." The additional payments could reflect either additional sales of M&R's kiwis by Trinity, or that Trinity performed an additional internal audit and concluded that additional amounts should be remitted to M&R. Given the totality of the evidence identified by the parties, there is nothing about the additional payments that supports a reasonable inference that M&R and Trinity had agreed to be subject to a book account.

Because the commercial conduct and agreements between M&R and Trinity do not reflect an agreement to be bound by a book account, summary judgment in favor of Trinity is appropriate. See H&C Global, 2013 U.S. Dist. LEXIS 159185 at *6-*7; Armstrong Petroleum, 116 Cal.App.4th 1375, 1396 n.9; Maggio, 196 Cal.App.3d at 752; H. Russell Taylor, 99 Cal.App.3d at 728.

## CONCLUSION[4]

Trinity moves for summary judgment on the remaining claims against it.

With respect to the fourth cause of action for an account stated, there is insufficient evidence that the parties struck a balance due and assented to that balance as being what Trinity owed to M&R. White's supplemental declaration affirmatively negates assent, and neither Raden's March 31 e-mail nor Martini's April 11 letter indicate that a balance was ever struck. Therefore, summary judgment in favor of Trinity will be granted.

With respect to the fifth cause of action for a book account, there is insufficient evidence that the parties agreed either through their conduct or through their express agreements to be subject to a book account. Without such an agreement, M&R cannot recover for an open book account. Therefore, summary judgment in favor of Trinity will be granted.

---

[4] Trinity made additional arguments in support of its summary judgment motion. However, given the Court's resolution of the motion, it is unnecessary to address those arguments.

# **ORDER**

Accordingly, IT IS HEREBY ORDERED that:

1. Defendant's second motion for summary judgment is GRANTED;
2. All pending dates and deadlines are VACATED; and
3. The Clerk shall enter judgment in favor of Defendant and CLOSE this case.

IT IS SO ORDERED.

Dated:   September 9, 2014

SENIOR DISTRICT JUDGE